Kavon Adli, California State Bar No. 203040
Seth W. Wiener, California State Bar No. 203747
THE INTERNET LAW GROUP
609 Karina Court
San Ramon, California 94582
Telephone:    (925) 487-5607
Facsimile:    (310) 356-3257

Attorneys for Defendant
LendingTree, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CARMEN SORIANO, an individual; MARY JOYCE VALLARTA, an individual; MOLLY VONGCHAN, an individual, | Case No. 17-cv-7078 |
| Plaintiffs, | **DECLARATION OF SETH W. WIENER IN SUPPORT OF DEFENDANT'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§1332(a), 1441, 1446** |
| vs. | |
| LENDINGTREE, LLC, a Delaware limited liability company; and DOES 1-100, | |
| Defendants. | |

I, Seth W. Wiener, declare,

    1.    I am the attorney at The Internet Law Group, which is counsel to Defendant LendingTree, LLC ("Defendant") in the above-captioned action.  I have personal knowledge of the facts set forth herein, and if called to testify, I could and would testify competently thereto.

    2.    Attached hereto as Exhibit A is a true and correct copy of Plaintiff's Complaint, filed on September 7, 2017, in California Superior Court, the City and County of San Francisco, Case No. CGC-17-561185, as well as the Document Scanning Lead Sheet, Summons, and Civil Case Cover Sheet.

1      3.     Attached hereto as Exhibit B is a true and correct copy of the Decision of the

2  California Court of Appeal in *Balsam v. Trancos, Inc.*, dated February 24, 2012, 203 Cal.App.4th

3  1083 (Cal. App. Ct. 2012).

4      4.     Attached hereto as Exhibit C is a true and correct copy of the Declaration of Daniel

5  Balsam in support of Defendant's motion for attorneys' fees, dated March 6, 2014, filed in the

6  action, *XL Marketing Corp., et al. v. Kristina Kirby*, Case No. 4:11-cv-05707 (N.D. Cal. 2011)

7  (PJH).

8      5.     Attached hereto as Exhibit D is a true and correct copy of the Declaration of

9  Timothy Walton in support of Defendants' motion for attorneys' fees dated March 6, 2014, filed

10  in the action, *XL Marketing Corp., et al. v. Kristina Kirby*, Case No. 4:11-cv-05707 (N.D. Cal.

11  2011) (PJH).

12      6.     Attached hereto as Exhibit E is a true and correct copy of excerpts from the

13  magazine, "The Trial Lawyer," pp. 14-17 (Summer 2012), in which Mr. Balsam is interviewed as

14  to his cases involving Cal. Bus. & Prof. Code §17529.5.

15      I declare under penalty of perjury under the laws of the United States of America that the

16  foregoing is true and correct.

17  Dated:    December 12, 2017

18

19                  By:_____

20                       Seth W. Wiener

# EXHIBIT A



**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SAN FRANCISCO**

# Document Scanning Lead Sheet

Sep-07-2017  3:44 pm

Case Number: CGC-17-561185

Filing Date: Sep-07-2017 3:39

Filed by:  KALENE APOLONIO

Image: 06016753

COMPLAINT

CARMEN SORIANO ET AL VS. LENDINGTREE, LLC ET AL

001C06016753

**Instructions:**
Please place this sheet on top of the document to be scanned.

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

LENDINGTREE, LLC, a Delaware limited liability company; and DOES 1-100

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

CARMEN SORIANO, an individual;
(Additional Parties Attachment is Attached)

| |
|---|
| FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*  San Francisco Superior Court<br><br>400 McAllister<br>San Francisco, CA 94102 | CASE NUMBER:<br>*(Número del Caso):*<br>**CGC-17-561185** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jacob Harker (SBN: 261262); 582 Market, Ste. 1007, San Francisco, CA 94104; (415) 624-7602

| | | |
|---|---|---|
| DATE:<br>*(Fecha)*  SEP 07 2017 | CLERK OF THE COURT<br>*(Secretario)*  KALENE APOLONIO | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Page 1 of 1<br>Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Soriano, et al. v. LENDINGTREE, LLC, et al. | |

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.):*

[✓] Plaintiff   [ ] Defendant   [ ] Cross-Complainant   [ ] Cross-Defendant

MARY JOYCE VALLARTA, an individual;

MOLLY VONGCHAN, an individual.

Plaintiffs.

Page __2__ of __2__

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

American LegalNet, Inc.
www.FormsWorkflow.com

1  Jacob Harker (State Bar No. 261262)
2  LAW OFFICES OF JACOB HARKER
   582 Market Street, Suite 1007
3  San Francisco, CA 94104
4  Tel: (415) 624-7602
   Fax: (415) 684-7757
5  Email: jacob@harkercounsel.com
6
   Daniel L. Balsam (State Bar No. 260423)
7  THE LAW OFFICES OF DANIEL BALSAM
   2601C Blanding Avenue #271
8  Alameda, CA 94501
9  Tel: (415) 869-2873
   Fax: (415) 869-2873
10 Email: legal@danbalsam.com
11
12 Attorneys for Plaintiff
13
14          SUPERIOR COURT OF THE STATE OF CALIFORNIA
15     COUNTY OF SAN FRANCISCO (UNLIMITED JURISDICTION)
16
17 CARMEN SORIANO, an individual;      ) Case No.:  **CGC-17-561185**
   MARY JOYCE VALLARTA, an individual; )
18 MOLLY VONGCHAN, an individual;      )
                                       ) COMPLAINT FOR DAMAGES
19                                     )
20          Plaintiffs,               ) 1.  VIOLATIONS OF CALIFORNIA
        v.                             )     RESTRICTIONS ON UNSOLICITED
21                                     )     COMMERCIAL E-MAIL (Cal. Bus. &
22 LENDINGTREE, LLC, a Delaware limited )     Prof. Code § 17529.5)
   liability company; and             )
23 DOES 1-100;                        )
                                       )
24          Defendants.               )
25 _____)
26 COME NOW PLAINTIFFS CARMEN SORIANO, *et al.* and file this Complaint for one cause
27 of action against Defendants LENDINGTREE, LLC *et al.* and allege as follows:
28
29     **I. INTRODUCTION AND SUMMARY OF THE COMPLAINT**
30 Plaintiffs CARMEN SORIANO, *et al.* bring this Action against professional spammers
31 LENDINGTREE, LLC ("LENDINGTREE"), and their third party advertising networks and

**F I L E D**
San Francisco County Superior Court

SEP 0 7 2017

CLERK OF THE COURT
BY: _____
                Deputy Clerk

1

**COMPLAINT**

affiliates (aka "publishers"), for sending 138 unlawful unsolicited commercial emails ("spams") to Plaintiffs.  A representative sample is attached to this Complaint as **Exhibit A**.

1.      Plaintiffs neither gave direct consent to receive commercial email advertisements from, nor had a preexisting or current business relationship with, the entities who sent or advertised in the spams.

2.      The spams all materially violated California Business & Professions Code § 17529.5 ("Section 17529.5") due to: a) materially false and deceptive information contained in or accompanying the email headers (i.e. Subject Line), and/or b) Subject Lines misleading relative to the contents of the emails.

3.      LENDINGTREE is strictly liable for advertising in spams sent by their third party marketing agents.

4.      Spam recipients are not required to allege or prove reliance or actual damages to have standing. *See* Bus. & Prof. Code § 17529.5(b)(1)(A)(iii).  Nevertheless, Plaintiffs did suffer damages by receiving the spams. *See, e.g.,* Bus. & Prof. Code § 17529(d), (e), (g), (h). However, Plaintiffs elect to recover statutory damages only and forego recovery of any actual damages. *See* Bus. & Prof. Code § 17529.5(b)(1)(B).

5.      This Court should award liquidated damages of $1,000 per email as provided by Section 17529.5(b)(1)(B)(ii), and not consider any reduction in damages, because LENDINGTREE and its marketing agents failed to implement reasonably effective systems to prevent advertising in unlawful spams.  The unlawful elements of these spams represent willful acts of falsity and deception, rather than clerical errors.

6.      This Court should award Plaintiffs their attorneys' fees pursuant to Section 17529.5(b)(1)(C). *See also* Code of Civil Procedure § 1021.5, providing for attorneys fees when private parties bear the costs of litigation that confers a benefit on a large class of persons; here, by reducing the amount of false and deceptive spam received by California residents.

///
///
///

**2**
**COMPLAINT**

## II. PARTIES

### A. Plaintiffs

7.     CARMEN SORIANO ("SORIANO") was domiciled in and a citizen of the State of California, when she received the spams at issue.  The spams at issue were sent to SORIANO's email address livewpeace@yahoo.com that she ordinarily accesses from California.

8.     MARY JOYCE VALLARTA ("VALLARTA") was domiciled in and a citizen of the State of California, when she received the spams at issue.  The spams at issue were sent to VALLARTA's email address fernjoy@yahoo.com that she ordinarily accesses from California.

9.     MOLLY VONGCHAN ("VONGCHAN") was domiciled in and a citizen of the State of California, when she received the spams at issue.  The spams at issue were sent to VONGCHAN's email address msouvan@yahoo.com that she ordinarily accesses from California.

### B. Defendants

10.     Plaintiffs are informed and believe and thereon allege that Defendant LENDINGTREE, LLC ("LENDINGTREE") is now, and was at all relevant times, a Delaware limited liability company with a principal place of business in Charlotte, North Carolina.

11.     Plaintiffs do not know the true names or legal capacities of the Defendants designated herein as DOES 1 through 100, inclusive, and therefore sue said Defendants under the fictitious name of "DOE."  Plaintiffs are informed and believe and thereon allege that each of the Defendants designated herein as a DOE is legally responsible in some manner for the matters alleged in this complaint, and is legally responsible in some manner for causing the injuries and damages of which Plaintiffs complain.  Plaintiffs are informed and believe and thereon allege that each of the Defendants designated herein as a DOE Defendant was, at all times relevant to the matters alleged within this complaint, acting in conjunction with the named Defendants, whether as a director, officer, employee, agent, affiliate, customer, participant, or co-conspirator. When the identities of DOE Defendants 1-100 are discovered, or otherwise made available, Plaintiffs will seek to amend this Complaint to allege their identity and involvement with particularity.

12.     Defendants' joinder in this Action is proper pursuant to Code of Civil Procedure § 379 because Plaintiffs seek relief jointly and severally from Defendants arising form the same series of transactions and occurrences, and because common questions of law and fact as to Defendants

1   will arise in the Action.  The fact that all Defendants may not be implicated in all spams does not
2   bar joinder: "It is not necessary that each defendant be interested as to every cause of action or as
3   to all relief prayed for.  Judgment may be given against one or more defendants according to
4   their respective liabilities."  Code Civ. Proc. § 379.
5
6                         **III.  JURISDICTION AND VENUE**
7   **A.  Jurisdiction is Proper in a California Superior Court**
8   13.      This California Superior Court has jurisdiction over the Action because Plaintiffs are
9   located in California, and the amount in controversy is more than $25,000.
10  **B.  Venue is Proper in San Francisco County**
11  14.      Venue is proper in San Francisco County (or indeed, *any* county in California of
12  Plaintiff's choosing) because LENDINGTREE is a foreign company that has not designated the
13  location and address of a principal office in California.  *See Easton v. Superior Court of San*
14  *Diego (Schneider Bros. Inc.)*, 12 Cal. App. 3d 243, 246 (4th Dist. 1970).
15
16                         **IV.  138 UNLAWFUL SPAMS**
17  15.      Plaintiffs allege that Defendants engaged in tortious conduct: "wrongful act[s] other than
18  a breach of contract for which relief may be obtained in the form of damages or an injunction."
19  *See* Merriam-Webster, www.merriam-webster.com/dictionary/tort (last viewed Nov. 5, 2013).
20  16.      California's False Advertising Law, Business & Professions Code § 17500
21              prohibits "not only advertising which is false, but also advertising which[,]
              although true, is either actually misleading or which has a capacity, likelihood or
22              tendency to deceive or confuse the public." . . . . [T]he UCL and the false
              advertising law prohibit deceptive advertising even if it is not actually false.
23
24  *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 226-27 (2d Dist. 2013) (citation omitted).
25  **A.  The Emails at Issue are "Spams"; Recipients and Counts**
26  17.      The emails at issue are "commercial email advertisements"[1] because they were initiated
27  for the purpose of advertising and promoting LENDINGTREE's products and services.
28  _____
29  [1] "'Commercial e-mail advertisement' means any electronic mail message initiated for the
30  purpose of advertising or promoting the lease, sale, rental, gift offer, or other disposition of any
    property, goods, services, or extension of credit."  Bus. & Prof. Code § 17529.1(c).
31

                                    **4**
                              **COMPLAINT**

18.     The emails are "unsolicited commercial email advertisements"[2] because Plaintiffs did not give "direct consent"[3] to, and did not have a "preexisting or current business relationship"[4] with any Defendant.

19.     Plaintiffs did not consent or acquiesce to receive the spams at issue.  Plaintiffs did not waive or release any rights or claims related to the spams at issue.

20.     LENDINGTREE advertised in, sent, and/or conspired to send at least 138 unlawful spams that Plaintiffs received at their "California email addresses"[5] as shown below:

| PLAINTIFF | SPAMS RECEIVED | PLAINTIFF | SPAMS RECEIVED |
|---|---|---|---|
| SORIANO | 53 | VALLARTA | 26 |
| VONGCHAN | 59 | TOTAL | 138 |

21.     The spams are all unlawful because there is materially false and deceptive information contained in or accompanying the email headers as described in more detail below.

---

[2] "'Unsolicited commercial e-mail advertisement' means a commercial e-mail advertisement sent to a recipient who meets both of the following criteria: (1) The recipient has not provided direct consent to receive advertisements from the advertiser. (2) The recipient does not have a preexisting or current business relationship, as defined in subdivision (*l*), with the advertiser promoting the lease, sale, rental, gift offer, or other disposition of any property, goods, services, or extension of credit."  Bus. & Prof. Code § 17529.1(o).

[3] "'Direct consent' means that the recipient has expressly consented to receive e-mail advertisements *from the advertiser*, either in response to a clear and conspicuous request for the consent or at the recipient's own initiative."  Bus. & Prof. Code § 17529.1(d) (emphasis added).

[4] "'Preexisting or current business relationship,' as used in connection with the sending of a commercial e-mail advertisement, means that the recipient has made an inquiry and has provided his or her e-mail address, or has made an application, purchase, or transaction, with or without consideration, regarding products or services offered by the advertiser. []"  Bus. & Prof. Code § 17529.1(*l*).

[5] "'California e-mail address' means 1) An e-mail address furnished by an electronic mail service provider that sends bills for furnishing and maintaining that e-mail address to a mailing address in this state; 2) An e-mail address ordinarily accessed from a computer located in this state; 3) An e-mail address furnished to a resident of this state."  Bus. & Prof. Code § 17529.1(b).

COMPLAINT

**B. Spams With Absolutely False and Misrepresented Subject Lines Violate Business & Professions Code § 17529.5(a)(2)**

22.     Section 17529.5(a)(2) prohibits falsified or misrepresented information contained in or accompanying email headers.

23.     The Subject Line is part of email headers.

24.     Many of the spams that Plaintiffs received contain Subject Lines with falsified and/or misrepresented information.  Plaintiffs allege that these Subject Lines are *absolutely* false and/or misrepresented and violate Section 17529.5(a)(2), as well as being misleading *relative* to the contents/body of the spams, which would be a violation of Section 17529.5(a)(3) (discussed below).

25.     All or nearly all of the spams contain the same false or misrepresented subject line: "[recipient] Confirm Your Personal Loan #987."  In reality, there was no Loan #987 (or any other number) to confirm.

**C. Spams With Subject Lines Misleading Relative to the Contents of the Spams Violate Business & Professions Code § 17529.5(a)(3)**

26.     Section 17529.5(a)(3) prohibits Subject Lines that are misleading relative to the contents or subject matter of the emails.

1.     All or most of the spams that Plaintiffs received contain Subject Lines misleading relative to the contents of subject matter of the emails, which violates Section 17529.5(a)(3).

27.     All or most of the spams contain subject line: "[recipient] Confirm Your Personal Loan #987,"  which implies: a) a preexisting relationship exists between LENDINGTREE and the recipient; b) based on the preexisting relationship, the recipient has been approved for a loan; c) the loan has a unique number; and d) the only step the recipient must take to finalize the loan is to confirm it.

28.     However, once the recipient opens the email, he/she learns that: a) there is no preexisting relationship between LENDINGTREE and the recipient; b) there is no loan approval; c) there is no unique loan number; and d) the recipient *cannot* finalize the loan by confirming it – because no loan exists.  Rather, the recipient discovers that the email is an advertisement offering the recipient an opportunity to apply for a loan.

6

**COMPLAINT**

**D. LENDINGTREE is Strictly Liable for Spams Sent By its Marketing Agents**

29.     Plaintiffs are informed and believe and thereon alleges that LENDINGTREE contracted with third party advertising networks and affiliates, including but not limited to the other Defendants, to advertise its websites for the purpose of selling products and services for a profit.

30.     No one forced LENDINGTREE to outsource any of its advertising to third party spam networks and spammers.

31.     Advertisers are liable for advertising in spams, even if third parties hit the Send button.

> There is a need to regulate the advertisers who use spam, as well as the actual spammers because the actual spammers can be difficult to track down due to some return addresses that show up on the display as "unknown" and many others being obvious fakes and they are often located offshore.
>
> The true beneficiaries of spam are the advertisers who benefit from the marketing derived from the advertisements.

Bus. & Prof. Code § 17529(j)(k).

> It is unlawful [ ] *to advertise in* a commercial email advertisement [ ] under any of the following circumstances…

Bus. & Prof. Code § 17529.5 (emphasis added).  Of course, LENDINGTREE's agents are also liable for sending unlawful spams.  *See Balsam*, generally.

32.     In fact, in *Hypertouch Inc. v. ValueClick Inc. et al*, the court of appeal held that advertisers are *strictly liable* for advertising in false and deceptive spams, even if the spams were sent by third parties.

> *[S]ection 17529.5* makes it unlawful for a person or entity "to advertise in a commercial e-mail advertisement" that contains any of the deceptive statements described in *subdivisions (a)(1)-(3)*. Thus, by its plain terms, the statute is not limited to entities that actually send or initiate a deceptive commercial e-mail, but applies more broadly to any entity that advertises in those e-mails.
>
> Thus, like other California statutes prohibiting false or misleading business practices, the statute makes an entity *strictly liable* for advertising in a commercial e-mail that violates the substantive provisions described in section 17529.5, subdivision (a) *regardless of whether the entity knew that such e-mails had been sent* or had any intent to deceive the recipient.

192 Cal. App. 4th 805, 820-21 (2d Dist. 2011) (emphasis added).  The court did not find that this was an arbitrary requirement; rather, the court identified sound policy reasons behind the Legislature's decision to create a strict liability statute.  *Id.* at 829.

7

COMPLAINT

**E. Plaintiffs Sue for Statutory Liquidated Damages; No Proof of Reliance or Actual Damages is Necessary**

33.     The California Legislature defined liquidated damages to be $1,000 per spam.  Bus. & Prof. Code § 17529.5(b)(1)(B)(ii).

34.     Plaintiffs are informed and believe and thereon allege that the $1,000 per spam figure is comparable with damages in other areas of consumer protection law, e.g., $500-$1,500 statutory damages per junk fax, pursuant to Business & Professions Code § 17538.43(b).

35.     Plaintiffs' rightful and lawful demand for liquidated damages in the amount of $1,000 per email is necessary to further the California Legislature's objective of protecting California residents from unlawful spam.

36.     Section 17529.5 does not require Plaintiffs to quantify their actual damages, allege or prove reliance on the advertisements contained in the spams, or purchase the goods and services advertised in the spams.  *Recipients* of unlawful spam have standing to sue and recover liquidated damages.  Bus. & Prof. Code § 17529.5(b)(1)(A)(iii); *Hypertouch*, 192 Cal. App. 4th at 820, 822-23, 828.

37.     However, Plaintiffs did suffer damages by receiving the unlawful spams advertising LENDINGTREE's products and services in the state of California, at his California email addresses.  Bus. & Prof. Code § 17529(d), (e), (g), (h).  Regardless, Plaintiffs do not seek actual damages in this Action, only liquidated damages.  Bus. & Prof. Code § 17529.5(b)(1)(B).

**F. Defendants' Actions Were Willful and Preclude any Reduction in Statutory Damages**

38.     Section 17529.5 authorizes this Court to reduce the statutory damages to $100 per spam.  Bus. & Prof. Code § 17529.5(b)(2).  But, to secure the reduction, Defendants have the burden of proof to demonstrate not only that *established* practices and procedures to prevent unlawful spamming, but also that they *implemented* those practices and procedures, and that the practices and procedures are *effective*.

39.     Plaintiffs are informed and believe and thereon allege that Defendants have not established and implemented, with due care, practices and procedures reasonably designed to effectively prevent unsolicited commercial e-mail advertisements that are in violation of Section 17529.5.

40.     Even if Defendants had established any practices and procedures to prevent advertising in unlawful spam, such practices and procedures were not reasonably designed so as to be effective.

41.    Even if Defendants reasonably designed practices and procedures to prevent advertising in unlawful spam, such practices and procedures were not implemented so as to be effective.

42.    Moreover, Plaintiffs are informed and believe and thereon allege that Defendants intended to deceive recipients of their spam messages through the use of falsified and/or misrepresented information in Subject Lines as described herein.

43.    Subject Lines do not write themselves.  The false and misrepresented information contained in and accompanying the email headers are not "clerical errors."

44.    Plaintiffs are informed and believe and thereon allege that Defendants went to great lengths to create falsified and misrepresented information contained in and accompanying the email headers in order to deceive recipients.  Plaintiffs are informed and believe and thereon allege that Defendants intended to profit, actually profited, and continue to profit, and were unjustly enriched by, their wrongful conduct as described herein.

## FIRST CAUSE OF ACTION

### [Violations of California Restrictions on Unsolicited Commercial Email, California Business & Professions Code § 17529.5]
### (Against All Defendants)

45.    Plaintiffs hereby incorporate the foregoing paragraphs as though set forth in full herein.

46.    Plaintiffs received the spams at issue within one year prior to filing this Complaint.

47.    LENDINGTREE advertised in, sent, and/or caused to be sent at least 138 unsolicited commercial email advertisements to Plaintiffs' California electronic mail addresses that had materially falsified and/or misrepresented information contained in or accompanying the email headers and Subject Lines misleading as to the contents of the email, in violation of Section 17529.5.  The unlawful elements of these spams represent willful acts of falsity and deception, rather than clerical errors.

48.    The California Legislature set liquidated damages at One Thousand Dollars ($1,000) per email.

49.    Defendants have not established and implemented, with due care, practices and procedures to effectively prevent advertising in unlawful spams that violate Section 17529.5 that would entitle them to a reduction in statutory damages.

50.     Plaintiffs seek reimbursement of attorneys' fees and costs as authorized by Section 17529.5(b)(1)(C).

51.     The attorneys' fees provision for a prevailing spam recipient is typical of consumer protection statutes and supported by Code of Civil Procedure § 1021.5.  By prosecuting this action, Plaintiffs expect to enforce an important right affecting the public interest and thereby confer a significant benefit on the general public or a large class of persons.  The necessity and financial burden of private enforcement is such as to make the award appropriate, and the attorneys' fees should not, in the interest of justice, be paid out of the recovery of damages.

WHEREFORE, Plaintiffs pray for judgment against Defendants as hereinafter set forth.

## PRAYER FOR RELIEF
### (Against All Defendants)

A.   An Order from this Court declaring that Defendants violated California Business & Professions Code § 17529.5 by advertising in and sending unlawful spams.

B.   Liquidated damages against Defendants in the amount of $1,000 for each of at least 138 unlawful spams, as authorized by Section 17529.5(b)(1)(B)(ii), for a total of at least $138,000 as set forth below:

| PLAINTIFF | DAMAGES SOUGHT | PLAINTIFF | DAMAGES SOUGHT |
|-----------|----------------|-----------|----------------|
| SORIANO | $53,000 | VALLARTA | $26,000 |
| VONGCHAN | $59,000 | TOTAL | $138,000 |

C.   Liquidated damages against LENDINGTREE in the amount of $138,000 based on 138 spams that it sent, hired others to send, or otherwise conspired with others to send, to Plaintiff.

D.   Liquidated damages against DOES 1-100 (when their true names are learned) in the amount of $138,000 based on 138 spams that they sent, hired others to send, or otherwise conspired with others to send, to Plaintiffs.

E.   Attorneys' fees as authorized by Section 17529.5(b)(1)(C) and Code of Civil Procedure § 1021.5 for violations of Section 17529.5.

F.   Costs of suit.

G.    Such other and further relief as the Court deems proper.

THE LAW OFFICES OF JACOB HARKER

Date:   September 7, 2017                    BY: _____

JACOB HARKER
Attorneys for Plaintiff

EXHIBIT "A"

# EXHIBIT A

Print                                                      https://mg.mail.yahoo.com/neo/launch?.rand=c65bmguvksed#5112633102

**Subject:** msouvan Confirm Your Personal Loan #987

**From:** LendingTree Partners (LendingTree.Partners@hysoansy.com)

**To:** msouvan@yahoo.com;

**Date:** Monday, November 14, 2016 3:30 AM

### msouvan Confirm Your Personal Loan #987

11/28/2016 8:52 PM

https://mgmail.yahoo.com/neo/launch?.rand=o65tsmgavkscd#5112633102



✔ Debt Consolidation   ✔ Car Financing   ✔ Business

✔ Home Buying   ✔ Medical Expenses   ✔ Wedding

Start Loan Request >

**\*Advertising Disclosures**

LendingTree, LLC dba LendingTreePartners.com is a duly licensed mortgage broker, as required, with its main office located at 11115 Rushmore Dr., Charlotte, NC 28277. Telephone number 1-877-703-8733. NMLS Unique Identifier #1136.

Print                                                          https://mg mail.yahoo.com/neo/launch?.rand=e65txngxvkxcd#5112633102

This is a commercial email from LendingTreePartners.com and may be recurring
Unsubscribe | Privacy Policy | Terms of Use | Disclosures and Licenses | Advertising Disclosures



This is an advertisement. We respect your privacy and pledge not to abuse your email address. Your email has
been verified to receive offers from one of our affiliates. If you would like to unsubscribe from future emails of
this type, please "click here to unsubscribe" or write to AdReaction Sheikh Zayed Road, Al Wasl Area
Emirat Atrium Building Office 432, Dubai, P.O. Box 112344

**CM-010**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>Jacob Harker (SBN: 261262)<br>Law Offices of Jacob Harker<br>582 Market, Ste. 1007<br>San Francisco, CA 94104<br>TELEPHONE NO.: (415) 624-7602   FAX NO.: (415) 684-7757<br>ATTORNEY FOR *(Name)*:  Plaintiffs | **FOR COURT USE ONLY**<br><br>**FILED**<br>San Francisco County Superior Court<br><br>SEP 07 2017<br><br>CLERK OF THE COURT<br>BY: _Ralene Antonio_<br>Deputy Clerk |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF   San Francisco |
|---|
| STREET ADDRESS: 400 McAllister |
| MAILING ADDRESS: 400 McAllister |
| CITY AND ZIP CODE: San Francisco, 94102 |
| BRANCH NAME: Civic Center Courthouse |

| CASE NAME: |
|---|
| Soriano, et al. v. LENDINGTREE, LLC, et al. |

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: |
|---|---|---|---|
| ☑ **Unlimited**<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ **Limited**<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | **CGC-17-561185**<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

**1. Check one box below for the case type that best describes this case:**

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☑ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☐ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☐ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/Inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☐ Securities litigation (28)
- ☐ Environmental/Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition *(not specified above)* (43)

**2.** This case ☐ is  ☑ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
- a. ☐ Large number of separately represented parties
- b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
- c. ☐ Substantial amount of documentary evidence
- d. ☑ Large number of witnesses
- e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
- f. ☐ Substantial postjudgment judicial supervision

**3.** Remedies sought *(check all that apply)*: a. ☑ monetary  b. ☐ nonmonetary; declaratory or injunctive relief  c. ☐ punitive

**4.** Number of causes of action *(specify)*:  ONE

**5.** This case ☐ is  ☑ is not  a class action suit.

**6.** If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 7, 2017

Jacob Harker
_____
(TYPE OR PRINT NAME)                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Page 1 of 2<br>Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

# EXHIBIT B

Balsam v. Trancos, Inc., 203 Cal.App.4th 1083 (2012)
138 Cal.Rptr.3d 108, 12 Cal. Daily Op. Serv. 2303, 2012 Daily Journal D.A.R. 2555

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by DeWitt v. DeVry University, Inc., Cal.App. 1
Dist., July 8, 2015

203 Cal.App.4th 1083
Court of Appeal, First District, Division 1, California.

Daniel L. BALSAM, Plaintiff and Appellant,
v.
TRANCOS, INC., et al., Defendants and
Appellants.

Nos. A128485, A129458.
|
Feb. 24, 2012.
|
As Modified on Denial of Rehearing March 21,
2012.
|
Review Denied May 23, 2012.
|
Certiorari Denied Oct. 29, 2012.
|
See 133 S.Ct. 544.

**Synopsis**
**Background:** E-mail recipient brought action against
advertising business, its founder and chief executive
officer (CEO), and others for violations of the Anti-spam
Law and Consumer Legal Remedies Act (CLRA). The
Superior Court, San Mateo County, No. CIV471797,
Marie S. Weiner, J., found that recipient lacked standing
to bring CLRA claim, but entered judgment awarding
statutory damages and attorney fees against business
under the Anti-spam Law. Advertising business appealed,
and recipient cross-appealed.

**Holdings:** The Court of Appeal, Margulies, J., held that:

[1] "From" line in e-mails falsified or misrepresented the
senders' identity in violation of the Anti-spam Law;

[2] federal CAN–SPAM Act of 2003 did not preempt
application of California's Anti-spam Law;

[3] attorney's handwritten time sheets were adequate to
support award of attorney fees;

[4] recipient was not a "consumer" of any goods or
services and thus lacked standing to bring CLRA action;

and

[5] CEO had no individual liability under the Anti-spam
Act.

Affirmed.

**West Headnotes (17)**

[1]     **Telecommunications**
        Unsolicited e-mail

        "From" line in e-mails sent by advertising
        company falsified or misrepresented the
        senders' identity in violation of the Anti-spam
        Law, as senders' privately registered domain
        names were whimsical combinations of words
        such as "moussetogether.com"; the domain
        names did not represent a real company and
        could not be readily traced back to advertising
        company, which was the owner of the domain
        names and true sender of the e-mails, through a
        publicly available domain name database.
        West's Ann.Cal.Bus. & Prof.Code §
        17529.5(a)(2).

        *See Annot., Validity, Construction, and*
        *Application of Federal and State Statutes*
        *Regulating Unsolicited E-mail or "Spam"*
        *(2006) 10 A.L.R.6th 1; Cal. Jur. 3d, Consumer*
        *and Borrower Protection Laws, § 307; Cal.*
        *Civil Practice (Thomson Reuters 2011) Business*
        *Litigation, § 61:44.*

        6 Cases that cite this headnote

[2]     **Telecommunications**
        Unsolicited e-mail

        Where a commercial e-mailer intentionally uses
        privately registered domain names in its headers
        that neither disclose the true sender's identity on
        their face nor permit the recipient to readily
        identify the sender, such header information is

Balsam v. Trancos, Inc., 203 Cal.App.4th 1083 (2012)
138 Cal.Rptr.3d 108, 12 Cal. Daily Op. Serv. 2303, 2012 Daily Journal D.A.R. 2555

deceptive and does constitute a falsification or misrepresentation of the sender's identity under the Anti-spam Law. West's Ann.Cal.Bus. & Prof.Code § 17529.

8 Cases that cite this headnote

[3]  **Telecommunications**
☞Unsolicited e-mail

A domain name is "traceable" to the sender, for purposes of the Anti-spam Law, if the recipient of an e-mail could ascertain the sender's identity and physical address through the use of a publicly available database. West's Ann.Cal.Bus. & Prof.Code § 17529.

4 Cases that cite this headnote

[4]  **Courts**
☞Operation and effect in general

While not binding, a nonpublished federal district court case can be citable as persuasive authority.

Cases that cite this headnote

[5]  **Telecommunications**
☞Unsolicited e-mail

Header information in a commercial e-mail is falsified or misrepresented under the Anti-spam Law when it uses a sender domain name that neither identifies the actual sender on its face nor is readily traceable to the sender using a publicly available online database. West's Ann.Cal.Bus. & Prof.Code § 17529.5(a)(2).

8 Cases that cite this headnote

[6]  **States**
☞Telecommunications; wiretap
**Telecommunications**
☞Preemption; interplay of federal, state and local law

Federal CAN–SPAM Act of 2003 did not preempt application of California's Anti-spam Law in e-mail recipient's action against advertising company, as company's deliberate use of randomly chosen, untraceable domain names on the "From" line of the subject e-mails for the stated purpose of concealing its role in sending them involved deception as to the material matter of the sender's identity, as well as an element of wrongful conduct. Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, § 2, 15 U.S.C.A. § 7701; West's Ann.Cal.Bus. & Prof.Code § 17529.5(a)(2).

2 Cases that cite this headnote

[7]  **States**
☞Telecommunications; wiretap
**Telecommunications**
☞Preemption; interplay of federal, state and local law

Federal CAN–SPAM Act of 2003 preempts state law claims based on no more than immaterial or nondeceptive inaccuracies or omissions in commercial e-mails. Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, § 2, 15 U.S.C.A. § 7701.

1 Cases that cite this headnote

[8]  **Appeal and Error**
☞Attorney fees
**Costs**
☞Items and amount; hours; rate

A trial court is vested with wide discretion in fixing the amount to be awarded to a prevailing

party for attorney fees, and a court's award will not be disturbed on appeal unless the record discloses an abuse of discretion.

Cases that cite this headnote

[9]  **Appeal and Error**
     Questions of Fact on Motions or Other Interlocutory or Special Proceedings
     **Costs**
     Evidence as to items

The experienced trial judge is the best judge of the value of professional services rendered in her court, and while her judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.

Cases that cite this headnote

[10]  **Costs**
      Evidence as to items

Detailed time sheets are not necessarily required to support attorney's fee awards.

Cases that cite this headnote

[11]  **Telecommunications**
      Actions

E-mail recipient's attorney's handwritten time sheets were adequate to support award of attorney fees in action under the Anti-spam Law; each daily time sheet was contemporaneously prepared, and specified the client's name, the matter worked on, the task performed, and the time spent on the task; submitted timesheets only included days in which attorney worked on the case, and each day included no more than a handful of different entries, handwriting is perfectly legible, and the abbreviations used were easily understood, and

an accompanying declaration added up the hours spent on the case, broken down by quarter and type of task performed. West's Ann.Cal.Bus. & Prof.Code § 17529.5(a)(2).

Cases that cite this headnote

[12]  **Telecommunications**
      Actions

Total of 166.9 hours spent by attorney on e-mail recipient's Anti-spam Law action, which was reduced by 10.9 hours spent on defective summary judgment motion, was not unreasonable for purposes of an award of attorney fees; action covered three-year period and included five-day court trial, and attorney's time was reduced by time which recipient, who also was a lawyer, spent on the case himself. West's Ann.Cal.Bus. & Prof.Code § 17529.5.

Cases that cite this headnote

[13]  **Telecommunications**
      Actions

E-mail recipient who prevailed in action under the Anti-spam Law could recover attorney fees, for attorney's second chair at trial, at rate of $250 per hour for 75.5 hours, where second attorney had extensive pretrial civil litigation experience and assisted with trial preparation, and maintained the organization of the files, exhibits, and evidence at trial, and rate for a lawyer of his experience was not excessive. West's Ann.Cal.Bus. & Prof.Code § 17529.5.

Cases that cite this headnote

[14]  **Telecommunications**
      Actions

E-mail recipient could recover $81,900 in attorney fees in Anti-spam Law action even

though ultimate $7,000 award could have been obtained in small claims court or in a limited civil case and e-mail sender had already shut down its list management operation; recipient originally sought liquidated damages of $8,000 for eight e-mails, which exceeded the then-applicable small claims maximum of $7,500, and unsuccessfully also sought permanent injunctive relief under the Consumer Legal Remedies Act (CLRA), which was beyond the scope of a limited civil case, and there was no showing recipient knew sender was out of the business when he filed suit, or that its voluntary abandonment would have affected his right to relief. West's Ann.Cal.Bus. & Prof.Code § 17529.

Cases that cite this headnote

[15]     **Telecommunications**
         🗝️Actions

Trial court's failure to issue a statement of reasons did not establish that it acted arbitrarily and capriciously in awarding attorney fees to e-mail recipient in action under the Anti-spam Law; court did not merely "rubber stamp" the fee request, but instead required recipient to submit additional documentation after the original motion was filed, and invited additional briefing, court's comments showed it had read the parties' extensive submissions and was fully conversant with their positions and documentation, court responded directly to e-mail sender's objections as they were raised, and court accepted some of sender's arguments and awarded recipient substantially less than he had originally requested. West's Ann.Cal.C.C.P. §§ 580, 1033.

1 Cases that cite this headnote

[16]     **Antitrust and Trade Regulation**
         🗝️Consumers, purchasers, and buyers; consumer transactions

Spam e-mail recipient was not a "consumer" of

any goods or services and thus lacked standing to bring Consumer Legal Remedies Act (CLRA) action against e-mail sender, where recipient did not seek or acquire any of the goods or services advertised in the e-mails, which were entirely unsolicited, recipient clicked on the links in some of the e-mails to see where they would take him, but had no intention of buying anything, and recipient suffered no damages as a result of the deceptive conduct which the sender used when sending the e-mails, which purported to be from non-existent companies. West's Ann.Cal.Civ.Code §§ 1761(d), 1780.

2 Cases that cite this headnote

[17]     **Corporations and Business Organizations**
         🗝️Participation in unauthorized or wrongful acts of corporation in general

Internet advertising business's chief executive officer (CEO) and founder had no individual liability under the Anti-spam Act for e-mails sent to unwilling recipient from division of business which had acquired address lists; CEO had minimal involvement with the division's operations. and did not participate in most of its decisions, he did not knowingly consent to or approve of any unlawful acts on its part, and the legal violation that did occur of sending out e-mails using domain names on the "From" line that were untraceable to the sender stemmed from a consultant's recommendation on which CEO reasonably relied for reasons unrelated to the Anti-spam Law. West's Ann.Cal.Civ.Code § 2343; West's Ann.Cal.Bus. & Prof.Code § 17529.

Cases that cite this headnote

**Attorneys and Law Firms**

**111** Nelson & Weinkauf, Robert L. Nelson and Susan B. Cohen, San Rafael, for Defendants and Appellants Trancos, Inc. and Brian Nelson.

Law Offices of Timothy J. Walton, Aptos, Timothy J.

Walton for Plaintiff and Appellant Daniel L. Balsam.

## Opinion

MARGULIES, J.

**\*1088** Defendant Trancos, Inc. (Trancos), appeals from a judgment awarding statutory damages and attorney fees to plaintiff Daniel L. Balsam under Business and Professions Code[1] section 17529 et seq. (Anti-spam Law). Balsam cross-appeals from portions of the judgment denying him relief under the Consumers Legal Remedies Act, Civil Code section 1750 et seq. (CLRA), and finding Trancos's chief executive officer (CEO), Brian Nelson, not personally liable for the judgment along with Trancos. We affirm the judgment in all respects.

## I. BACKGROUND

Balsam filed suit against Trancos, Nelson, and other individuals and entities[2] in April 2008, alleging causes of action for (1) violations of section 17529.5,[3] (2) violations of the CLRA, and (3) declaratory relief as to the legality of defendants' actions under these statutes.

A court trial commenced on October 14, 2009. At the outset of the trial, the court ruled Balsam lacked standing to sue under the CLRA because he was not a "consumer" of any goods or services as defined in Civil Code section 1761, subdivision (d) and he did not sustain any damages caused by defendants' conduct as required by Civil Code section 1780. The court further held Balsam's Anti-spam Law cause of action was not preempted by federal law, as asserted by defendants. Balsam agreed to the dismissal of his declaratory relief cause of action before trial.

**\*1089 A. *Trial Evidence***

### 1. *The Parties*

Nelson is the CEO and founder of Trancos, which operates several Internet advertising businesses. In 2007, Trancos operated a division called Meridian E-mail (Meridian). Through Meridian, Trancos acquired the right to use e-mail address lists from nine entities, including Hi-Speed Media (Hi-Speed), which is owned by ValueClick. Under its agreement with Hi-Speed, Trancos found advertisers that would pay to have their offers and promotions sent out to Hi-Speed's list, and Trancos would split the revenues with Hi-Speed.[4] Trancos hired a consultant, Joe **112** Costeli, to "manage" the list, which

meant he would upload the content the advertiser provided for the subject line and body of the e-mail to Trancos's e-mail servers, and send them out. Costeli would generate the domain name used in the "From" line.

Nelson testified he believed Hi-Speed obtained e-mail addresses by using promotions and Web sites in which the consumer gave his or her broad consent to receive future commercial e-mail messages from Hi-Speed or any of its "partners." Nelson maintained such a consent extended to Trancos as well as to any advertiser whose messages Trancos sent out to Hi-Speed's e-mail list, subject to the recipient's right to unsubscribe or "opt out" of future messages, which was offered as an option in all of the commercial e-mail messages Trancos sent.

Balsam is a licensed California attorney with experience in consumer protection litigation. Balsam has been either a named plaintiff or has represented plaintiffs in dozens of lawsuits against companies for unsolicited e-mail advertising. He maintains a Web site and blog with information on spammers and spam litigation. He maintains over 100 e-mail addresses.

### 2. *The E-mails*

Balsam owns four computers, all of which are located in California. In the summer of 2007, Balsam received eight commercial e-mails sent by Trancos to one of his e-mail addresses using Hi-Speed's e-mail list. According to each of the eight e-mails, Balsam allegedly gave consent for use of his e-mail address on " '2007 July 11' " by responding to an offer on a Web site owned by Hi-Speed using a computer with the Internet protocol address or IP address 64.184.86.246. Balsam presented uncontradicted evidence he could not have accessed Hi-Speed's Web site from that IP address on that date, and **\*1090** did not otherwise provide his e-mail address to or consent to its use by Hi-Speed, Trancos, or any of the advertisers named in the eight e-mails.

The e-mails Balsam received had the following relevant content:

E-mail No. 1 stated on the "From" line that it was from "Paid Survey" with an e-mail address of survey@misstepoutcome.com. The subject line stated: "Get paid 5 dollars for 1 survey." The content in the body of the e-mail was a commercial advertisement purportedly by "Survey Adventure." Paid Survey was not the name of any existing company. There was no company named misstepoutcome and no Web site at www.misstepoucome.com.[5] The latter is a fanciful name Trancos gave to one of the 477 domain names it has

privately registered.[67] As in all eight of **113 the e-mails, Trancos's name does not appear anywhere in the e-mail.

In regard to opting out of future e-mails, e-mail No. 1 stated the recipient could do so by writing to "Strategic Financial Publishing, Inc." at an address in Indiana or by clicking on a link to "http://misstepoutcome.com./soi?m=79444&!=2." There was a second opt-out link near the end of the e-mail stating in part "if you no longer wish to receive our emails please click *here.*" The name "USAProductsOnline.com" appeared at the end of the e-mail with a specified street address and suite number on Santa Monica Boulevard in Los Angeles. The domain name, USAProductsOnline.com, is privately registered to Trancos, but there is no actual company named USAProductsOnline.com, no such entity is registered as a fictitious business name of Trancos, and there is no Web site at www. USAProductsOnline.com. The street address given for it is the address of The UPS Store, where Trancos *1091 rented a post office box in the name of USAProductsOnline.com. The suite number referenced in the e-mail was actually Trancos's mailbox number at The UPS Store.[8]

E-mail No. 2 stated it was from "Your Business" with an e-mail address of franchisegator@modalworship.com. There was no actual business named Your Business, no actual entity named modalworship, and no Web site at modalworship.com. The subject line stated: "Be Your Own Boss! You could own a franchise!" The body of the e-mail consisted of a commercial advertisement purportedly by Franchise Gator. E-mail No. 2 advised recipients they may opt out by sending a copy of the e-mail to Franchise Gator at a Seattle address or by clicking on a link. Like all eight of the e-mails sent to Balsam, e-mail No. 2 provided a second opt-out link and the name and same Santa Monica Boulevard street address for USAProductsOnline.com.

E-mails Nos. 3 through 8 contained "From" lines stating the sender was, respectively, "Christian Dating," "Your Promotion," "Bank Wire Transfer Available," "eHarmony," "Dating Generic," and "Join Elite." Each purported to be from an e-mail address at a different one of the fancifully named domain names privately registered to Trancos (e.g., moussetogether.com, nationalukulelee.com). Only one of the e-mails, e-mail No. 6 purporting to be from eHarmony, contained the name of an actual, existing company on its "From" line, although the return e-mail address, eHarmony@minecyclic.com, referenced a domain name privately registered by Trancos, not one belonging to eHarmony.

Nelson testified Trancos privately registered its domain names due to past incidents of retaliation and threats, and to protect its employees. According to Nelson, one person angry with the company had bombarded it with millions of e-mails, knocking out Trancos's network for three days and costing the company approximately $120,000. Trancos had also received angry and threatening telephone calls demanding the caller's e-mail address be removed from its list. Nelson testified he had been advised that private registration was a good idea because "what if **114 there's a complaint, you know, I don't want someone like Dan Balsam ... driving through my front window or coming in there and harassing us or ... phoning us and badgering us."[9]


*1092 **3. The Anti-spam Law**

Section 17529.5 makes it unlawful as follows to send e-mail advertisements containing certain falsified or misrepresented header information: "(a) It is unlawful for any person or entity to advertise in a commercial e-mail advertisement either sent from California or sent to a California electronic mail address under any of the following circumstances: [¶] ... [¶] (2) The e-mail advertisement contains or is accompanied by falsified, misrepresented, or forged header information. This paragraph does not apply to truthful information used by a third party who has been lawfully authorized by the advertiser to use that information."

The California statute does not define the term "header information," but the California Supreme Court in *Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334 [110 Cal.Rptr.3d 628, 232 P.3d 625] (*Kleffman*) applied a definition borrowed from the federal CAN-SPAM Act of 2003 (15 U.S.C. § 7701 et seq.),[10] which makes it unlawful to initiate transmission of a commercial e-mail message that contains or is accompanied by " 'header information that is materially false or materially misleading.' " (*Kleffman*, at p. 340, fn. 5, 110 Cal.Rptr.3d 628, 232 P.3d 625, quoting from 15 U.S.C. § 7704(a)(1).) The federal spam law defines "header information" as "the source, destination, and routing information attached to an electronic mail message, *including the originating domain name and originating electronic mail address, and any other information that appears in the line identifying, or purporting to identify, a person initiating the message.*" (15 U.S.C. § 7702(8), italics added.) Although this case was tried before *Kleffman* was decided, it was undisputed by the parties that the "header information" in the Trancos e-mails, for purposes of section 17529.5, included the purported sender names, domain names, and e-mail addresses that appeared on the e-mails' "From" lines.

Section 17529.5 of the Anti-spam Law provides a recipient of an unsolicited commercial e-mail advertisement may bring an action against a person or entity that violates its provisions for either or both actual damages or liquidated damages of $1,000 for each unsolicited commercial e-mail violating the section. (§ 17529.5, subd. (b).) The prevailing plaintiff in such an action may recover reasonable attorney fees and costs. (*Ibid.*)

***1093 B. *Statement of Decision***
The trial court found all of the e-mails except the eHarmony e-mail violated section 17529.5, subdivision (a)(2) (hereafter section 17529.5(a)(2)). The court found the header information on each of these e-mails was falsified or misrepresented because it did not accurately represent who sent the e-mail: "All of these emails came from Defendant Trancos, but none of the emails disclose this in the header (or the body or the opt-out). The emails were sent on behalf of eight different advertisers ... but only eHarmony was a real company. The rest of the 'senders' identified in the headers ... do not exist or are otherwise misrepresented, namely, Paid Survey, Your Business, Christian Dating, Your Promotion, Bank Wire Transfer **115 Available, Dating Generic, and Join Elite[.] In those same headers reflecting the 'from' line of the email, the referenced sender email is a non-existen[t] entity using a nonsensical domain name reflecting no actual company...." The court added that the issue was not the use of multiple domain names to send spam, which it noted was before the California Supreme Court in the *Kleffman* case. Instead, the court held the falsity or misrepresentation consisted in the fact "that the 'sender' names (or domain names used) *do not represent any real company, and cannot be readily traced back to the true owner/sender.*" (Italics added.)

The trial court awarded Balsam $1,000 in liquidated damages against Trancos for each of the seven e-mails it found to have violated section 17529.5 of the Anti-spam Law, and found Trancos liable for his reasonable attorney fees and costs. It found Nelson was not personally liable for the award. Balsam thereafter sought attorney fees in the amount of $133,830. The court awarded him $81,900 in fees.

**C. *Appeals and Cross-appeal***
Trancos appealed from the judgment (case No. A128485) and postjudgment order awarding fees (case No. A129458). Balsam cross-appealed (case No. A128485) on the issues of whether he had standing to sue under the CLRA and whether Nelson was jointly and severally liable for Trancos's violations of the Anti-spam Law. The appeals were consolidated for briefing, argument, and decision.

## II. DISCUSSION

Trancos contends the judgment must be reversed because (1) the California Supreme Court held in *Kleffman* that the sending of commercial e-mails from multiple and nonsensically named domain names does not violate section 17529.5(a)(2), part of the Anti-spam Law and (2) the federal CAN-SPAM Act preempts application of California's Anti-spam Law in this case absent a ***1094 finding of all elements of common law fraud, including reliance and actual damages. Trancos contends in the alternative that, assuming the e-mails did violate the Anti-spam Law, the trial court abused its discretion in granting Balsam $81,900 in attorney fees.

In his cross-appeal, Balsam maintains the trial court erred in (1) finding he lacked standing to seek injunctive relief under the CLRA as a consumer damaged by Trancos's unlawful practices and (2) failing to hold Nelson jointly and severally liable along with Trancos for violating the Anti-spam Law even though Nelson personally participated in and ratified Trancos's tortious conduct.

**A. *Falsification/Misrepresentation***
[1] The specific issue decided in *Kleffman* was whether "it is unlawful [under section 17529.5(a)(2) ] to send commercial e-mail advertisements from multiple domain names for the purpose of bypassing spam filters." (*Kleffman, supra,* 49 Cal.4th at p. 337, 110 Cal.Rptr.3d 628, 232 P.3d 625.) By way of background, the *Kleffman* court explained that each entity connected to the Internet (such as a computer or network) must have a unique numeric address, known as an Internet protocol or IP address that enables other computers or networks to identify and send information to it. (*Ibid.*) An IP address consists of four sets of numbers separated by periods, such as "12.34.56.78." (*Ibid.*) But because the number strings that make up an IP address can be difficult to remember, the Internet community developed the domain name system, which enables users to substitute an easier to remember domain **116 name such as "google.com" for a set of number strings. (*Ibid.*)

Kleffman alleged in his complaint that Vonage, through

its marketing agents, sent him 11 unsolicited e-mail advertisements for its broadband telephone services, identifying 11 different domain names as the senders of the e-mail. (*Kleffman, supra,* 49 Cal.4th at p. 338, 110 Cal.Rptr.3d 628, 232 P.3d 625.) The domain names, such as " 'ourgossipfrom.com' " and " 'countryfolkgospel.com' " were all fanciful or nonsensical, and did not refer to Vonage or to any other existing business or entity. (*Ibid.*) All were traceable to a single physical address in Nevada where Vonage's marketing agent was located. The complaint further alleged the use of multiple domain names was for the purpose of evading the spam filters used by Internet service providers to block spam before it reached their customers' e-mail boxes. (*Ibid.*) The complaint alleged " '[t]he multitude of "from" identities falsifie[d] and misrepresent[ed] the true sender's identity and allow[ed] unwanted commercial e-mail messages to infiltrate consumers' inboxes.' " (*Id.* at p. 339, 110 Cal.Rptr.3d 628, 232 P.3d 625.) After removal to federal court, defendant Vonage moved successfully to dismiss the complaint on the grounds that it failed to state a claim under section 17529.5(a)(2). (*Kleffman,* at p. 339, 110 Cal.Rptr.3d 628, 232 P.3d 625.) Kleffman *1095 appealed to the Ninth Circuit, which asked the California Supreme Court to decide whether the use of multiple domain names for the purpose of bypassing spam filters violated the statute. (*Id.* at p. 339, 110 Cal.Rptr.3d 628, 232 P.3d 625.)

At the outset of its analysis, the Supreme Court noted there was no dispute the domain names used in the challenged e-mails "actually exist and are technically accurate, literally correct, and fully traceable to Vonage's marketing agents," and the e-mails therefore "neither contained nor were accompanied by 'falsified ... or forged header information' within the meaning of section 17529.5(a)(2)." (*Kleffman, supra,* 49 Cal.4th at p. 340, 110 Cal.Rptr.3d 628, 232 P.3d 625.) The parties agreed the issue for the court was whether the e-mails contained or were accompanied by " 'misrepresented ... header information' " within the meaning of that subdivision. (*Kleffman,* at p. 340, 110 Cal.Rptr.3d 628, 232 P.3d 625.) Kleffman argued the domain names, while not actually false, were "misrepresented" because their random, garbled, and nonsensical nature created a misleading or deceptive impression the e-mails were all from different entities when in fact they were all from Vonage via a single marketing agent. (*Id.* at pp. 341–342, 110 Cal.Rptr.3d 628, 232 P.3d 625.)

Based on a close reading of the text and legislative history of the statutory language in issue, the Supreme Court rejected Kleffman's argument that the word

"misrepresented" in section 17529.5(a)(2) means " 'misleading' " or " 'likely to mislead.' " (*Kleffman, supra,* 49 Cal.4th at pp. 342–345, 110 Cal.Rptr.3d 628, 232 P.3d 625.) The court also found the Legislature did not intend subdivision (a)(2) "generally to prohibit the use of multiple domain names." (*Kleffman,* at p. 345, 110 Cal.Rptr.3d 628, 232 P.3d 625.) Thus, as Kleffman conceded, the mere use of multiple domain names does not " 'in and of itself' " violate the subdivision. (*Kleffman,* at p. 345, 110 Cal.Rptr.3d 628, 232 P.3d 625.)

Furthermore, the court found the use of a domain name in a single e-mail that "does not make clear the identity of either the sender or the merchant-advertiser on whose behalf the e-mail advertisement is sent" also does not per se violate section 17529.5(a)(2). **117 (*Kleffman, supra,* 49 Cal.4th at p. 345, 110 Cal.Rptr.3d 628, 232 P.3d 625.) The court found such use does not in fact make any representation, express or implied, regarding the e-mail's source. (*Id.* at pp. 345–346, 110 Cal.Rptr.3d 628, 232 P.3d 625.) In addition, the court concluded that construing the statute otherwise would raise a substantial question about its constitutionality under the supremacy clause of the United States Constitution. (*Kleffman,* at p. 346, 110 Cal.Rptr.3d 628, 232 P.3d 625.) Citing to *Gordon, supra,* 575 F.3d at page 1064, and to the legislative history of the CAN–SPAM Act, the court opined that a state law requiring an e-mail's "From" field to include the actual name of the sender would constitute a content or labeling requirement preempted by the federal law. (*Kleffman,* at p. 346, 110 Cal.Rptr.3d 628, 232 P.3d 625.)

While expressly declining to define what the statutory phrase " 'misrepresented ... header information' " *includes* rather than what it *excludes,* the court reached the following conclusion: "[A] single e-mail with an *1096 accurate and traceable domain name neither contains nor is accompanied by 'misrepresented ... header information' within the meaning of section 17529.5(a)(2) merely because its domain name is ... 'random,' 'varied,' 'garbled,' and 'nonsensical' when viewed in conjunction with domain names used in other e-mails. An e-mail with an accurate and traceable domain name makes no *affirmative* representation or statement of fact that is false .... [and] .... cannot reasonably be understood to be an implied assertion that the source of this e-mail is different from the source of another e-mail containing a different domain name." (*Kleffman, supra,* 49 Cal.4th at p. 347 & fn. 11, 110 Cal.Rptr.3d 628, 232 P.3d 625.)

This case presents a different factual scenario than the one addressed by the Supreme Court in *Kleffman* in three critical respects. First, the trial court in this case did not decide Trancos's use of multiple, random, nonsensical

Balsam v. Trancos, Inc., 203 Cal.App.4th 1083 (2012)

138 Cal.Rptr.3d 108, 12 Cal. Daily Op. Serv. 2303, 2012 Daily Journal D.A.R. 2555

domain names to defeat spam filters or to otherwise create an impression its e-mails were from different senders in and of itself violated section 17529.5(a)(2). Second, the court did not decide the use of a domain name that failed to clearly identify Trancos violated the statute. Third, unlike *Kleffman,* this case did not involve the use of domain names both parties agreed were fully traceable to Trancos. Here, the trial court decided the fact the senders' domain names in seven of the e-mails did not represent a real company *and could not be readily traced back to Trancos, the owner of the domain names and true sender of the e-mails,* constituted falsification or misrepresentation for purposes of the statute. Further, unlike *Kleffman,* the salient motivation for the use of multiple, random domain names here was not to fool spam filters, but to prevent recipients of the e-mails from being able to identify Trancos as their true source. It was undisputed Trancos intentionally used only privately registered, meaningless domain names in order to prevent e-mail recipients from being able to identify it as the sender, or to contact it except by sending a blind reply e-mail to an address the sender would have no way of linking to Trancos. Because the facts here are distinguishable, and the Supreme Court in *Kleffman* expressly disclaimed an intention to determine the full scope of section 17529.5(a)(2), *Kleffman* informs our analysis, but does not dictate its result. (See *Kleffman, supra,* 49 Cal.4th at p. 347, fn. 11, 110 Cal.Rptr.3d 628, 232 P.3d 625.)

[2] *Kleffman* states: "An e-mail with an accurate *and traceable* domain name makes no affirmative representation or statement of fact that is false.... [and] **118 cannot reasonably be understood to be an implied assertion that the source of that e-mail is different from the source of another e-mail containing a different domain name." (*Kleffman, supra,* 49 Cal.4th at p. 347, 110 Cal.Rptr.3d 628, 232 P.3d 625, italics addedd & omitted.) The importance of being able to trace the owner of a domain name for purposes of evaluating a claim of misrepresented header information was also highlighted in *Gordon.* (See *Gordon, supra,* 575 F.3d at pp. 1063–1064.) *Gordon* addressed whether plaintiff Gordon's claim under a Washington State statute barring commercial e-mails that misrepresent their *1097 point of origin was preempted by the CAN–SPAM Act. (*Gordon,* at pp. 1057–1058.) In the course of holding the claim was preempted, the court found there was nothing "inherently deceptive" in the defendant's use of fanciful domain names based in part on the admitted fact that "a WHOIS search, or a similar reverse-look-up database, accurately identifies [the defendant] as the domain registrant and provides other identifying information." (*Id.* at pp. 1063–1064, fn. omitted.) According to *Gordon,* the use of

multiple domain names in those circumstances is not false or deceptive because it does not "impair a recipient's ability to identify, locate, or respond to the person who initiated the e-mail." (*Id.* at p. 1063.) But where, as in this case, the commercial e-mailer intentionally uses privately registered domain names in its headers that neither disclose the true sender's identity on their face nor permit the recipient to readily identify the sender, it is implicit in the reasoning of *Kleffman* and *Gordon* that such header information *is* deceptive and *does* constitute a falsification or misrepresentation of the sender's identity.

The federal CAN-SPAM Act incorporates a similar concept. The act makes it a crime to "materially falsif[y] header information in multiple commercial electronic mail messages." (18 U.S.C. § 1037(a)(3).) The act specifies "header information ... is materially falsified if it is altered or concealed in a manner that would impair the ability of a recipient of the message [(among others, including law enforcement)] ... to *identify, locate, or respond to a person who initiated the electronic mail message*...." (18 U.S.C. § 1037(d)(2), italics added; cf. *Omega World Travel, Inc. v. Mummagraphics* (4th Cir.2006) 469 F.3d 348, 357–358 (*Omega* ) [e-mail headers not materially false or misleading where the e-mail is "replete with accurate identifiers of the sender," including its telephone number and mailing address].)

Properly construed, *Kleffman* simply held a commercial e-mailer is not misrepresenting its identity when it uses multiple, randomly named, *but accurate and traceable,* domain names in order to avoid spam filters. The plaintiff in *Kleffman* had urged there was a vital distinction for purposes of section 17529.5(a)(2) between a commercial e-mailer who happened to use more than one domain name for mailing purposes and an e-mailer who deliberately used multiple, randomly chosen, nonsensically named domain names in order to create a misleading impression the e-mails were from different sources when they were in fact all from a single source. (*Kleffman, supra,* 49 Cal.4th at pp. 341–342, 110 Cal.Rptr.3d 628, 232 P.3d 625.) The Supreme Court found that distinction immaterial *provided* all of the names used were accurate and traceable to the sender.[11] **119 (*Kleffman,* at pp. 345–347, 110 Cal.Rptr.3d 628, 232 P.3d 625.) We are presented with a different case. *1098 Here, the domain names were *not* traceable to the actual sender. The header information is "falsified" or "misrepresented" because Trancos deliberately created it to prevent the recipient from identifying who actually sent the message. Thus, the nonsensical domain name "misstepoutcome.com" neither discloses Trancos's name nor can it be linked to Trancos using any public database. While, as *Kleffman* states, an e-mail with an accurate *and*

Balsam v. Trancos, Inc., 203 Cal.App.4th 1083 (2012)

138 Cal.Rptr.3d 108, 12 Cal. Daily Op. Serv. 2303, 2012 Daily Journal D.A.R. 2555

*traceable* domain name makes no affirmative representation or statement of fact that is false, an e-mail with a made-up *and untraceable* domain name affirmatively *and falsely* represents the sender has no connection to Trancos.

[3] The *Kleffman* court did not define what it meant by a *traceable* domain name. It did state specifically that the 11 e-mails at issue in that case could all be "traced" to a single physical address in Nevada where Vonage's marketing agent was located. (*Kleffman, supra,* 49 Cal.4th at p. 338, 110 Cal.Rptr.3d 628, 232 P.3d 625.) Although *Gordon* did not use the word "trace" or "traceable," it did place significance on the fact that a WHOIS search or similar database would provide the name, physical address, and other identifying information for the registrant/owner of all of the domain names used in that case. (*Gordon, supra,* 575 F.3d at p. 1064 & fn. 22.) Besides *Kleffman* and *Gordon,* our own research did not disclose any other cases that have used the term or discussed the concept of traceability in this context. The most relevant dictionary definition of the verb "trace" would seem to be "to ascertain by investigation; find out; discover." (Dictionary.com, trace < http://dictionary.reference.com/browse/trace> [as of Feb. 24, 2012].) We have no reason to believe the Supreme Court in *Kleffman* intended a different standard of investigation than that discussed in *Gordon.* If the court meant that a sender was "traceable" if a trained investigator or a determined litigant armed with discovery and subpoena rights could ascertain the sender's identity—as Balsam was required to do to find Trancos—it would have said so with particularity. We read *Kleffman* commonsensically in light of *Gordon* to mean that a domain name is "traceable" to the sender if the recipient of an e-mail could ascertain the sender's identity and physical address through the use of a publicly available database such as WHOIS.

There is good reason to treat a commercial e-mailer's deliberate use of untraceable, privately registered domain names to conceal its identity as a falsification or misrepresentation for purposes of the statute. Judging from Trancos's Meridian business, such e-mailers send out millions of commercial e-mail offers per month. Each such e-mail sent has the potential to cause harm to the recipient, ranging from mere annoyance or offense to more tangible harms such as inducing the recipient to visit Web sites that place *1099 malware or viruses on their computer, defraud them out of money, or facilitate identify theft.[12] Sending millions of such **120 e-mails, as Trancos did, makes harm inevitable. If Trancos deliberately hides its identity from recipients, as it concedes it did, what means of redress does a recipient

have? The recipient can send a blind e-mail message or a letter to a nonexistent company at a post office box making a complaint or attempting to opt out of future e-mails, but if Trancos (or an employee who sees the complaint) chooses not to respond or take any action, the recipient is at a dead end.[13] Because Trancos hides its identity behind an impenetrable shield of made-up names, an aggrieved recipient cannot look up public information about Trancos's business, cannot find its Web site, cannot call and speak to a Trancos employee, cannot write to Brian Nelson, cannot report Trancos to the Better Business Bureau or the Attorney General, and cannot warn others about Trancos by writing a letter to a newspaper or posting a complaint on the Internet. Using a privately registered domain name leaves it entirely up to Trancos whether it will or will not respond to or provide redress to persons (other than determined litigants like Balsam) who are harmed, annoyed, or offended by its communications.[14] Trancos does not explain why its business is so sensitive and so different from all other businesses that it must be free to hide its identity from the millions of individuals to whom it directed its commercial solicitations.

If anything, the absence of ordinary marketplace safeguards in commercial e-mailing suggests Trancos should bear some accountability to the recipients of its e-mails. By Trancos's own account, those recipients have not given any direct consent to receive e-mails from Trancos or its advertisers. The consent Trancos claims to have by virtue of recipients assertedly agreeing to receive e-mails from ValueClick and its partners is highly attenuated at best. Not *1100 being *customers* of Trancos, the recipients have no power to influence how Trancos deals with them by purchasing from someone else. Attempting to unsubscribe is not a practical option when the unwilling recipient has no ability to determine the sender's identity or good faith. In fact, Trancos's financial incentive, and possibly even its agreement with the list owner, is to mail out offers to as many recipients as possible as frequently as possible. Since it does not save Trancos a penny to remove a recipient from its **121 mailing list, it is by definition more expensive for Trancos to *stop* sending e-mails to any given recipient than it is to *keep* sending them. Moreover, recipients have no control over whose advertising messages Trancos is sending into their mailboxes and, with its own identity concealed from potential victims, Trancos has little incentive to make sure it is only advertising legitimate businesses. Allowing commercial e-mailers like Trancos to conceal themselves behind untraceable domain names amplifies the likelihood of Internet fraud and abuse—the very evils for which the Legislature found it necessary to regulate such e-mails when it passed the Anti-spam Law. (See § 17529.)

[4] Trancos relies on a nonpublished United States District Court case, *Asis Internet Services v. Member Source Media, LLC* (N.D.Cal., Apr. 20, 2010, No. C–08–1321 EMC) 2010 WL 1610066 (*Member Source* ), to show private registration does not matter under section 17529.5(a)(2). While not binding on us, a nonpublished federal district court case can be citable as persuasive authority. (*Olinick v. BMG Entertainment* (2006) 138 Cal.App.4th 1286, 1301, fn. 11 [42 Cal.Rptr.3d 268].) But we do not find *Member Source* persuasive on the question of traceability because the court does not address the issue. In *Member Source,* a federal magistrate judge found a commercial e-mailer's use of multiple, privately registered domain names in its headers was not false or deceptive, and a section 17529.5 claim based on that conduct was therefore preempted by the CAN-SPAM Act.[15] (*Member Source,* at p. \*4.) For that conclusion, *Member Source* relied exclusively on *Gordon,* finding the plaintiff's allegations in *Gordon* and those in the case before it were indistinguishable. (*Member Source,* at p. \*4.) *Member Source* made no mention of the plaintiff's concession in *Gordon* that the domain names the sender used were traceable to the sender using a WHOIS search, and did not address the apparent significance this had for the *Gordon* panel.

Trancos argues the subject e-mails *were* traceable to it in any event because each e-mail provided multiple ways to unsubscribe, an e-mail sent to the address on the "From" line would have been received and acted upon by **\*1101** Trancos, and Balsam could have complained to GoDaddy, which would have forwarded his complaint to Trancos.[16] However, the issue before us is not whether the recipient could have communicated its desire to opt out or written a complaint that might have come to Trancos's attention, but whether the "From" line falsified or misrepresented the sender's *identity*. As explained, the significance of being able to readily trace the sender's identity is that it gives the recipient recourse if the sender finds it expedient to ignore the recipient's communication.

[5] We therefore hold, consistent with the trial court's ruling, that header information in a commercial e-mail is falsified or misrepresented for purposes of section 17529.5(a)(2) when it uses a sender domain name that *neither* identifies the actual **\*\*122** sender on its face *nor* is readily traceable to the sender using a publicly available online database such as WHOIS.[17]

### B. *Federal Preemption*
[6] Trancos contends the federal CAN-SPAM Act preempts application of California's Anti-spam Law in

this case because, in its view, the act's express preemption clause exempting state statutes that prohibit falsity or deception in any portion of a commercial e-mail is properly construed to require a state law plaintiff to prove all elements of common law fraud. Since the trial court did not, for example, require Balsam to prove either reliance or actual damages, his claim would be preempted under Trancos's theory.

As Trancos acknowledges, there is a split in the recent decisions addressing the scope of the CAN-SPAM preemption. Some federal cases hold all elements of common law fraud must be established to survive preemption. (See, e.g., *Kleffman v. Vonage Holdings Corp.* (C.D.Cal., May 22, 2007) No. CV 07–2406 GAF(JWJx) 2007 WL 1518650 at p. \*3, affd. (9th Cir.2010) 2010 WL 2782847 [Congress left states room only to extend their traditional fraud prohibitions to the realm of commercial e-mails]; *ASIS Internet Services v. Optin Global Inc.* (N.D.Cal., Apr. 29, 2008) No. C–05–05124 JCS, 2008 WL 1902217 [relying on *Kleffman v. Vonage Holdings Corp.*].) Other federal cases have found the scope of the savings clause in the CAN-SPAM Act's preemption provision is broader than common law fraud. (See, e.g., **\*1102** *Asis Internet v. Consumerbargaingiveaways, LLC* (N.D.Cal.2009) 622 F.Supp.2d 935, 941–944 [§ 17529.5(a) claim not preempted even though plaintiffs could not prove reliance or damages, since " 'falsity or deception' " is not confined to strict common law fraud]; *Asis Internet Services v. Vistaprint USA, Inc.* (N.D.Cal.2009) 617 F.Supp.2d 989, 992–994 [same]; see also *Asis Internet Services v. Subscriberbase Inc.* (N.D.Cal., Apr. 1, 2010) No. 09–3503 SC, 2010 WL 1267763 at pp. \*9–\*13 [" 'falsity or deception' " exemption does not require proof of reliance or damages].)

The application of CAN-SPAM's preemption and savings clauses to claims under section 17529.5 was recently analyzed in depth by a Second District panel in *Hypertouch, supra,* 192 Cal.App.4th 805, 818–833, 123 Cal.Rptr.3d 8. The plaintiff's underlying claims in *Hypertouch* included, among others, that the "From" field in commercial e-mails sent out by third parties to drive traffic to ValueClick's Web sites violated section 17529(a)(2) by failing to accurately reflect the identity of the sender. (*Hypertouch,* at pp. 815–816, 123 Cal.Rptr.3d 8.) ValueClick moved for summary judgment in part on the grounds the CAN-SPAM Act's exemption for state statutes prohibiting "falsity or deception" was only intended to permit state law claims based on all elements of common law fraud. Since the plaintiff had no evidence ValueClick knew about the e-mails or any recipients relied on or were harmed by their deceptive content, the

Balsam v. Trancos, Inc., 203 Cal.App.4th 1083 (2012)

138 Cal.Rptr.3d 108, 12 Cal. Daily Op. Serv. 2303, 2012 Daily Journal D.A.R. 2555

plaintiff's claims were preempted. (*Hypertouch,* at p. 816, 123 Cal.Rptr.3d 8.)

*Hypertouch* rejected ValueClick's argument, holding instead "the CAN-SPAM Act's savings clause applies to any state law that prohibits material falsity or material deception in a commercial e-mail regardless of whether such laws require the plaintiff to prove and plead each and every **123 element of common law fraud." (*Hypertouch, supra,* 192 Cal.App.4th at p. 833, 123 Cal.Rptr.3d 8.) The CAN-SPAM Act therefore did not preempt the plaintiff's state statutory claims, the court reasoned, even though section 17529.5 does not require proof of three elements of common law fraud—scienter, reliance, and damages. (*Hypertouch,* at pp. 820–823, 826–830, 833, 123 Cal.Rptr.3d 8.) The court considered the text, legislative history, and purpose of the preemption and savings clauses at issue, concluding that Congress must have intended the phrase "falsity or deception" to encompass fraudulent or deceptive conduct that would not satisfy all elements of common law fraud. (*Id.* at pp. 826–830, 123 Cal.Rptr.3d 8.) We find the reasoning of *Hypertouch* persuasive on this issue, and adopt it here.

[7] *Hypertouch* rejected the view—also pressed by Trancos in this case—that the Fourth and Ninth Circuits in *Omega* and *Gordon,* respectively, took a more restrictive view of the CAN-SPAM Act's savings clause. (*Hypertouch, supra,* 192 Cal.App.4th at pp. 831–833, 123 Cal.Rptr.3d 8.) Although there is dicta in *Omega* that arguably goes further, we agree with *Hypertouch* that these cases merely decided "falsity or deception" connotes an element of tortiousness or wrongfulness and, therefore, state law claims based on no more than **1103 immaterial or nondeceptive inaccuracies or omissions in commercial e-mails are preempted. (See *Hypertouch,* at pp. 831–833, 123 Cal.Rptr.3d 8; *Omega, supra,* 469 F.3d at pp. 353–354; *Gordon, supra,* 575 F.3d at pp. 1063–1064.) In this case, Trancos's deliberate use of randomly chosen, untraceable domain names on the "From" line of the subject e-mails for the stated purpose of concealing its role in sending them does involve deception as to a material matter—the sender's identity—as well as an element of wrongful conduct. Trancos makes no argument to the contrary.

Accordingly, we will affirm the award of liquidated damages to Balsam. The award is neither inconsistent with the statute as construed in *Kleffman* nor preempted by federal law. We turn now to the attorney fee award and Balsam's cross-appeal.

**C. *Attorney Fees***

Trancos argues the trial court abused its discretion in awarding Balsam $81,900 in attorney fees because Balsam's fee motion was unsupported by proper documentation, including proper bills, an unambiguous statement of the hourly rate charged by Balsam's counsel, or complete, comprehensible timesheets. Trancos also claims the case could and should have been brought in small claims court without expenditure of attorney fees.

[8] [9] [10] A trial court is vested with wide discretion in fixing the amount to be awarded to a prevailing party for attorney fees, and a court's award will not be disturbed on appeal unless the record discloses an abuse of discretion. (*Rogel v. Lynwood Redevelopment Agency* (2011) 194 Cal.App.4th 1319, 1321 [125 Cal.Rptr.3d 267].) "The 'experienced trial judge is the best judge of the value of professional services rendered in [her] court, and while [her] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.' " (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303], quoting *Harrison v. Bloomfield Building Industries, Inc.* (6th Cir.1970) 435 F.2d 1192, 1196.) Detailed time sheets are not necessarily required to support fee awards. (*Margolin v. Regional Planning Com.* (1982) 134 Cal.App.3d 999, 1006–1007 [185 Cal.Rptr. 145].)

**124 [11] We have reviewed the handwritten timesheets of Counsel Timothy Walton supporting Balsam's motion which were submitted to the trial court on CD-ROM. Contrary to Trancos's representations, the timesheets are not illegible or incomprehensible. Each daily timesheet was contemporaneously prepared, and specifies the client's name, the matter worked on, the task performed, and the time spent on the task. Only days on which Walton worked on the Trancos case are included, and each day includes no more than *1104 a handful of different entries. The handwriting is perfectly legible, and the abbreviations used are easily understood (e.g., "TC" for telephone conference, "RF" for review file, etc.). While not as detailed as some attorney time-keeping records, Walton's timesheets were adequate. An accompanying declaration by him adds up the hours spent on this case, broken down by quarter and type of task performed. If Trancos felt Walton's summary was inaccurate or misleading, the raw data used was available to it to analyze in a different format.

[12] We do not find the hours recorded by Walton—a total of 166.9 over a nearly three-year period, including time spent on a five-day court trial and its aftermath—were unusual or unreasonable for a case of this difficulty and complexity. In fact, Walton's time spent on the case was undoubtedly reduced because Balsam, a licensed attorney

Balsam v. Trancos, Inc., 203 Cal.App.4th 1083 (2012)
138 Cal.Rptr.3d 108, 12 Cal. Daily Op. Serv. 2303, 2012 Daily Journal D.A.R. 2555

with considerable expertise in the subject matter of the lawsuit, devoted a substantial amount of his own, uncompensated time to the case. According to Balsam, this included most of the time spent on issues in which he did not prevail, such as his CLRA claim and Nelson's joint and several liability. Balsam was also billed for 86 hours of paralegal time he was unable to recover because the paralegals did not meet all requirements of Business and Professions code section 6450. The trial court reduced Walton's time by 10.9 hours to reflect time spent on a defective motion for summary judgment, and denied Balsam's request for a multiplier. We cannot say the trial court abused its discretion by awarding Balsam compensation based on 156 hours of attorney time spent on the case. We also find no fatal ambiguity in Walton's declaration. He states his customary and usual hourly rate was $400, and that Balsam was billed for his time and paid all amounts billed. Trancos makes no argument Walton's hourly rate was excessive. We find no abuse of discretion in the trial court's award of $62,400 for Walton's time.

[13] Trancos also objects to the trial court's award to Balsam of 75.5 hours at $250 per hour for Walton's second chair at trial, Jim Twu. Twu's resume showed he had extensive pretrial civil litigation experience after graduating from law school in 1994. Walton stated Twu assisted with trial preparation, and maintained the organization of the files, exhibits, and evidence at trial. As the trial court impliedly found, an hourly rate of $250 for a litigation attorney with Twu's experience is not excessive. Having presided at the trial, the trial judge was in the best position to evaluate whether this portion of the fee claim was reasonable. Trancos fails to establish the court abused its discretion.

[14] Trancos questions whether it was necessary for Balsam to incur the fees he did since the $7,000 awarded could have been obtained in small claims court or in a limited civil case, and Trancos had already shut down its Meridian operation in 2007. Trancos ignores the fact Balsam initially sought liquidated damages of $8,000 for eight e-mails, an amount exceeding the then **1105** applicable small claims maximum of $7,500. (Code Civ. Proc., former § 116.221.) He also sought permanent injunctive relief in connection with his **125** CLRA cause of action, which is beyond the scope of a limited civil case. (Code Civ. Proc., § 580, subd. (b)(2).) Trancos did not establish Balsam knew it was out of the list management business when he filed suit, or that its voluntary abandonment of the business would have affected his right to pursue monetary or even injunctive relief against it. In any event, as Trancos conceded in the trial court, it was within the court's discretion whether to

award fees notwithstanding that Balsam's ultimate recovery could have been rendered in a limited civil case. (Code Civ. Proc., § 1033, subd. (a).)

[15] Finally, Trancos argues the court acted arbitrarily and capriciously because it failed to explain the reasons for the award. No statement of reasons was required. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140 [104 Cal.Rptr.2d 377, 17 P.3d 735].) The record reflects the trial court did not merely "rubberstamp" Balsam's fee request. It required him to submit additional documentation after the original motion was filed, and invited additional briefing. The court's comments at the two hearings it held on the motion showed it had read the parties' extensive submissions and was fully conversant with their positions and documentation. At the second hearing, the court responded directly to Trancos's objections as they were raised. In the end, the court accepted some of Trancos's arguments and awarded Balsam substantially less than he had originally requested. We find no basis in the record to conclude the court acted arbitrarily or capriciously in failing to make greater reductions.

Accordingly, we affirm the trial court's order awarding fees.

### D. *Balsam's Cross-appeal*

#### 1. *Balsam's CLRA Standing*
[16] The trial court held Balsam lacked standing to sue under the CLRA because he (1) was not a "consumer" of any goods or services as defined in Civil Code section 1761, subdivision (d); and (2) did not sustain "any damage[s]" caused by defendants' conduct as required by Civil Code section 1780. Balsam disputes both conclusions.

The CLRA provides: "*Any consumer who suffers any damage* as a result of the use ... of a method, act, or practice declared to be unlawful by [Civil Code] Section 1770 may bring an action against that person to recover or obtain" specified relief including actual damages and an injunction against the unlawful method, act, or practice. (Civ.Code, § 1780, subd. (a), italics added.) Section 1770, subdivision (a) of the CLRA lists **1106** some 24 proscribed acts or practices, such as passing off goods and services as those of another, disparaging the business of another by false or misleading representations of fact, and inserting unconscionable provisions in a contract. A "consumer" is defined in Civil Code section 1761, subdivision (d), part of the CLRA, as "an individual who *seeks or acquires,* by purchase or lease, any goods or

Balsam v. Trancos, Inc., 203 Cal.App.4th 1083 (2012)

138 Cal.Rptr.3d 108, 12 Cal. Daily Op. Serv. 2303, 2012 Daily Journal D.A.R. 2555

services for personal, family, or household purposes."
(Italics added.)

Here, Balsam freely acknowledges he did not seek or
acquire any of the goods or services advertised in
Trancos's e-mails. Balsam testified the e-mails were
entirely unsolicited and he would never on principle buy
anything advertised in what he considered to be spam
e-mail. He stated he clicked on the links in some of
Trancos's e-mails to see where they would take him, but
with no intention of buying anything. Based on the plain
text of Civil Code section 1761, it is difficult to see how
Balsam could have been a "consumer" for purposes of the
CLRA.

Balsam focuses on the word "any" in Civil Code section
1761, arguing if the **126 Legislature intended to limit
standing only to persons who sought or acquired the
particular product or service being falsely advertised, it
would have chosen its words differently. According to
Balsam, the "consumer" definition was merely intended
to distinguish consumers from nonconsumers, such as
businesses or governmental entities, by specifying
consumers can bring CLRA actions, but businesses and
governmental entities cannot. Balsam does not explain
why the Legislature would have chosen such a
roundabout way of specifying only individuals could sue
under the CLRA. His interpretation would also render
nugatory the words "by purchase or lease" in the
definition.

The one case Balsam cites in support of his construction,
*Nordberg v. Trilegiant Corp.* (N.D.Cal.2006) 445
F.Supp.2d 1082 (*Nordberg* ), merely held plaintiffs who
were charged for products they did not seek or want
nonetheless met the CLRA definition of "consumer"
because the verb "acquire" in the definition did not
require any conscious action or desire on the plaintiffs'
part. (*Nordberg*, at pp. 1087–1088, 1095–1096.)
*Nordberg* did not adopt anything resembling the sweeping
"consumer" definition Balsam urges upon this court.
Under *Nordberg*'s interpretation, Balsam would not in
fact be a consumer since he neither sought *nor* acquired
any good or service connected to Trancos or its
advertisers. *Nordberg* thus undermines rather than
supports Balsam's position.

In *Schauer v. Mandarin Gems of Cal., Inc.* (2005) 125
Cal.App.4th 949 [23 Cal.Rptr.3d 233] (*Schauer* ), the
court held a woman suing a jeweler who had sold her
former husband an engagement ring based on a fraudulent
appraisal *1107 was not a "consumer" for purposes of the
CLRA: "Unfortunately for plaintiff, by statutory
definition [plaintiff's former husband] was the consumer

because it was he who purchased the ring. [Citation.] [Fn.
omitted.] Plaintiff's ownership of the ring was *not
acquired as a result of her own consumer transaction
with defendant*, and ... she [therefore] does not fall within
the parameters of consumer remedies under the Act."
(*Schauer*, at p. 960, 23 Cal.Rptr.3d 233, italics added.)
*Schauer* thus also takes a view of the statute inconsistent
with Balsam's.

In a case directly on point, a federal district court judge
specifically rejected Balsam's view of the CLRA, holding
a recipient of spam e-mail from Vonage was not a
"consumer" under the CLRA because he specifically
alleged he had not sought or acquired any products or
services offered by Vonage. (*Kleffman v. Vonage
Holdings Corp., supra*, 2007 WL 1518650 at p. *4.)
Citing *Schauer*, the court stated: "It is not enough that the
plaintiff is a consumer of just *any* goods or services;
rather, the plaintiff must have acquired or attempted to
acquire the goods or services in the transaction at issue."
(*Kleffman v. Vonage Holdings Corp.*, at p. *4.)

We agree with *Schauer* and reject Balsam's proposed
definition of "consumer." *Schauer*'s holding is reinforced
by the requirement the plaintiff suffer damage as a result
of the method, act, or practice alleged to be unlawful. A
person who did not seek, purchase, or lease any product
or service from a defendant, either directly or indirectly,
would seemingly be in no position to allege damage as a
result of the defendant's unlawful practice. Balsam tries
to thread that needle by arguing the phrase "any damage"
in Civil Code section 1780, subdivision (a) is much
broader than just pecuniary damages and can apparently
include even mere annoyance and loss of time. He cites
certain legislative findings and declarations contained in
section 17529, part of the Anti-spam Law, to show that all
**127 recipients of spam e-mails are damaged in various
ways including the passed-through costs of spam filtering
technologies, the consumption of valuable data storage
space, and annoyance and loss of time. (§ 17529, subds.
(d), (e), (g), (h).) Balsam then applies the simple
syllogism that since the Legislature found all recipients
of e-mail spam are damaged, and he was a recipient, it must
follow he suffered damage.

There are two problems with Balsam's argument. First,
the harms Balsam claimed he automatically suffered as a
result of being a recipient of spam are not the *result* of
any method, act, or practice allegedly made unlawful by
Civil Code section 1770, as the CLRA standing provision
requires. Balsam alleged the subject e-mails violated
various provisions of Civil Code section 1770,
subdivision (a) by misrepresenting their source and
containing other false or deceptive representations. To

Balsam v. Trancos, Inc., 203 Cal.App.4th 1083 (2012)
138 Cal.Rptr.3d 108, 12 Cal. Daily Op. Serv. 2303, 2012 Daily Journal D.A.R. 2555

support his CLRA cause of action, Balsam was required to prove "not only that [the] defendant's conduct was deceptive *but that the deception caused [him] harm.*" **\*1108** *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1292 [119 Cal.Rptr.2d 190], italics added.) The harms cited by the Legislature when it passed the Anti-spam Law do not satisfy that burden of proof. Those harms do not stem from the *deceptive content* of individual spam e-mails, but from the *excessive volume* of e-mail that spammers *collectively* send out over the Internet. Balsam's theory of how he was damaged, if accepted by the trial court, would have made it impossible for him to prove his damages were caused by Trancos's deceptive conduct under the CLRA. (See *Buckland v. Threshold Enterprises, Ltd.* (2007) 155 Cal.App.4th 798, 809–810 [66 Cal.Rptr.3d 543], disapproved on other grounds in *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 337 [120 Cal.Rptr.3d 741, 246 P.3d 877] [plaintiff's lack of actual reliance on defendant's deceptive packaging and advertising defeated her CLRA claim].)

This points to a second, related problem with Balsam's logic. In section 17529, the Legislature was addressing problems caused by the *collective* conduct of *many* spammers which taxes Internet resources and clogs individual in-boxes. These asserted harms are not the result of the conduct of any one commercial e-mailer, including Trancos. Balsam engages in a fallacy of division[18] when he tries to bootstrap legislative findings about the aggregate effects of abusive commercial e-mailing practices in general into an argument he personally must have suffered some unspecified damage as a result of the eight e-mails he received from Trancos.

Balsam maintains he was not required to prove reliance or causation because he was seeking only injunctive, not monetary, relief under the CLRA. He supports that proposition with a passage from *Annunziato v. eMachines, Inc.* (C.D.Cal.2005) 402 F.Supp.2d 1133, in which the court states there is no need to prove reliance or causation when the plaintiff is seeking an injunction to protect the public. (See *id.* at p. 1137.) But *Annunziato* involved no claims brought under the CLRA. (*Annunziato,* at p. 1136.) In the passage Balsam cites, *Annunziato* was concerned only with claims under the unfair competition law (§ 17200 et seq.) and the false advertising law (§ 17500 et seq.), and was in fact **\*\*128** distinguishing these laws from the CLRA, which does require proof of causation and damages. (*Annunziato,* at p. 1137.) By its own terms, section 1780, subdivision (a), part of the CLRA, requires a consumer sustain damages as a result of conduct made unlawful by Civil Code section 1770 in order to obtain *any* relief, whether

monetary or injunctive. Balsam fails to prove the statute means something different from what it says.

**\*1109** The trial court properly dismissed Balsam's CLRA cause of action.

### 2. *Nelson's Liability Under the Anti-spam Law*

[17] The trial court found Nelson had no individual liability to Balsam because Nelson "was acting at all relevant times as an officer and employee of Defendant Trancos Inc. in regard to the subject transactions...." Balsam disagrees, contending even if Nelson was acting within the course and scope of his duties, he personally participated in, authorized, and set in motion the actions taken by Trancos that violated the Anti-spam Law. In particular, Balsam points to evidence Nelson personally registered some of the domain names Trancos used for its Meridian operation, allowed his credit card to be used to pay for registration of the USAProductsOnline.com domain name, and agreed with and ratified independent contractor Costeli's recommendation the domain names used in the Meridian operation be privately registered. Balsam also cites to Nelson's testimony he was sure he must have been asked to make decisions concerning the Meridian business, but could not recall the specifics.

The relevant legal principles are reviewed in *PMC, Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368 at pages 1378–1389 [93 Cal.Rptr.2d 663] (*PMC* ). "Corporate director or officer status neither immunizes a person from personal liability for tortious conduct nor subjects him or her to vicarious liability for such acts. [Citations.] ... 'Directors or officers of a corporation do not incur personal liability for torts of the corporation merely by reason of their official position, unless they participate in the wrong or authorize or direct that it be done. They may be liable, under the rules of tort and agency, for tortious acts committed on behalf of the corporation. [Citations.]' ... '... "[A]n officer or director will not be liable for torts in which he does not personally participate, of which he has no knowledge, or to which he has not consented.... While the corporation itself may be liable for such acts, the individual officer or director will be immune unless he authorizes, directs, or in some meaningful sense actively participates in the wrongful conduct." ' " (*Id.* at p. 1379, 93 Cal.Rptr.2d 663.)

"A corporate director or officer's participation in tortious conduct may be shown not solely by direct action but also by *knowing consent to or approval of unlawful acts.*" (*PMC, supra,* 78 Cal.App.4th at p. 1380, 93 Cal.Rptr.2d 663, italics added.) "[T]he rule imposing liability on an officer or director for participation in or authorization of

tortious conduct has its roots in agency law. [Citations.] ... Civil Code section 2343 provides: 'One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency, in any of the following cases, and in no others: [¶] ... [¶] 3. *When his acts are wrongful in their nature.*' This rule applies to officers and directors." (*Id.* at p. 1381, 93 Cal.Rptr.2d 663, italics added; see also *McClory v. *1110 Dodge* (1931) 117 Cal.App. 148, 152–154 [4 P.2d 223], disapproved on other grounds in *Mary Pickford Co. v. Bayly Bros., Inc.* (1939) 12 Cal.2d 501, 522 [86 P.2d 102] [corporate directors personally **129 liable for misappropriation of plaintiff's stock when they knew or should have known conduct was wrongful].) An officer or director who commits a tort in reasonable reliance on expert advice or other information cannot be held personally liable for the resulting harm. (*PMC,* at pp. 1386–1387, 93 Cal.Rptr.2d 663.)

The evidence in this case did not warrant imposition of personal liability on Nelson. When he was asked what his involvement was in Meridian, Nelson responded: "I paid Joe [Costeli] his monthly consulting fees. Of course, I paid Garrett [Hunter, a Trancos vice president in charge of Meridian], touched base with Garrett on occasion on this. Again, he was working out of our Pacific Palisades office. I would come down every three weeks to say hi to them. That's it. I mean I signed ... off on the checks and release[d] payments to our advertisers and publishers." He further testified Costeli and Hunter usually did not ask him to make decisions about the operation, and although he was sure one of them must have asked him to make a decision on *some* aspect of the project, he could not remember any specifics. Nelson let Hunter use his credit card to register the USAProductsOnline.com domain name used in the mailings and he registered some of the domain names himself. Costeli told him it would be a good idea to privately register the domain names used in the operation, and Nelson agreed to it because of issues Trancos had had in the past, including being "mail bombed" by one person, and employees receiving threatening telephone calls.

Nelson had minimal involvement with Meridian's operations. He did not participate in most of its decisions. There is no evidence he *knowingly* consented to or approved of any unlawful acts on its part. The legal violation that did occur—sending out e-mails using domain names on the "From" line that were untraceable

to the sender—stemmed from a consultant's recommendation on which Nelson reasonably relied for reasons unrelated to the Anti-spam Law. There is no evidence Nelson knew or should have known using privately registered, untraceable domain names would violate the law or was otherwise tortious or wrongful. Doing so was not "wrongful in [its] nature." (Civ.Code, § 2343.)

Balsam cites no case remotely similar, and we have found none, in which personal liability was imposed on a corporate officer. *People v. Conway* (1974) 42 Cal.App.3d 875 [117 Cal.Rptr. 251] (*Conway*), cited by Balsam, is distinguishable. In *Conway,* the president of an auto dealership was held personally liable for the unlawful activities of his salesmen where the evidence showed that he controlled the business and "permitted the unlawful practices to continue after being informed of them on numerous occasions." *1111 Id.* at p. 886, 117 Cal.Rptr. 251.)[10] There is no evidence Nelson was informed in 2007 that using untraceable domain names on the "From" line of Meridian's e-mails violated the Anti-spam Law, yet allowed the practice to continue.

The trial court properly declined to hold Nelson jointly and severally liable with Trancos.

## **130 III. DISPOSITION

The judgment is affirmed. Balsam shall recover his costs on Trancos's appeal. Trancos and Nelson shall recover their costs on Balsam's cross-appeal.

Marchiano, P.J., and Banke, J., concurred.

## All Citations

203 Cal.App.4th 1083, 138 Cal.Rptr.3d 108, 12 Cal. Daily Op. Serv. 2303, 2012 Daily Journal D.A.R. 2555

Footnotes

1    All statutory references are to the Business and Professions Code unless otherwise indicated.

Balsam v. Trancos, Inc., 203 Cal.App.4th 1083 (2012)
138 Cal.Rptr.3d 108, 12 Cal. Daily Op. Serv. 2303, 2012 Daily Journal D.A.R. 2555

2      No defendants other than Trancos and Nelson are involved in this appeal.

3      Section 17529.5 is part of the Anti-spam Law. The term "spam" is defined in the law's findings and declarations to
       mean "unsolicited commercial e-mail advertisements." (§ 17529, subd. (a).) The probable origin of this popular usage,
       and its connotation as an annoying, unwanted, repetitious communication, was explained in *Hypertouch Inc. v.*
       *ValueClick, Inc.* (2011) 192 Cal.App.4th 805, 818, footnote 4 [123 Cal.Rptr.3d 8] (*Hypertouch*). (See also *Gordon v.*
       *Virtumundo, Inc.* (9th Cir.2009) 575 F.3d 1040, 1044–1045 & fn. 1 (*Gordon*).)

4      Nelson testified that a typical revenue-sharing agreement with Hi-Speed might include a requirement that e-mails be
       sent out to its list on a daily basis. He estimated Trancos sent millions of e-mails per month.

5      According to Trancos, even though the e-mail addresses appearing on the "From" lines of the eight e-mails, such as
       survey@misstepoutcome. com, did not reflect the names of any actual Web sites or businesses, they were all
       functioning e-mail addresses monitored by Trancos to which recipients could have sent return e-mails.

6      A "domain name" is defined in the Anti-spam Law as an "alphanumeric designation that is registered with or assigned
       by any domain name registrar as part of an electronic address on the Internet." (§ 17529.1, subd. (e).)

7      Trancos's domain names were registered through Domains by Proxy, a private registration service operated by The
       GoDaddy Group, Inc. (GoDaddy). With private registration, members of the public would not be able to determine that
       Trancos had any connection to the domain name. A search of publicly available databases such as "WHOIS" would
       show Domains by Proxy or GoDaddy as the domain name's owner, and provide no identifying or contact information
       about Trancos. According to Nelson, however, GoDaddy would have contacted Trancos if it received inquiries or
       complaints about commercial e-mails using one of Trancos's registered domain names.

8      Balsam was only able to trace the post office box to Trancos by subpoenaing The UPS Store to obtain the application
       submitted to it for the post office box. The application included a physical address for USAProductsOnline.com in
       Pacific Palisades that turned out to be Trancos's office at the time.

9      There was no testimony as to how Costeli chose the actual domain names. It may be inferred one motivation was to
       avoid disclosing Trancos as the sender. None of the domain names contained any variation or hint of Trancos's name.
       If the names themselves connected Trancos to the mailing, private registration would be pointless. Other potential
       motivations for the whimsical name choices—including evading spam filters and avoiding accidental infringement of
       names used by other businesses or Web sites—are not in issue in this case.

10     The CAN-SPAM Act's full title is the Controlling the Assault of Non–Solicited Pornography and Marketing Act of 2003.
       (Act of Dec. 16, 2003, Pub.L. No. 108–187, § 1, 117 Stat. 2699.)

11     As noted earlier, the plaintiff in *Kleffman* conceded the domain names used in the challenged e-mails "actually exist[ed]
       and [were] technically accurate, literally correct, and fully traceable to Vonage's marketing agents." (*Kleffman, supra,*
       49 Cal.4th at p. 340, 110 Cal.Rptr.3d 628, 232 P.3d 625.) Here, there was no concession the domain names were
       traceable to Trancos using any publicly available database, and the trial court specifically found they were not
       traceable. However, it was not disputed that the domain names actually existed and were owned by Trancos. Whether
       the e-mails were actually sent from the domains listed in their headers is a technical question that was not established
       one way or the other.

12     "[Unsolicited commercial e-mail (UCE) ] can be difficult if not impossible to identify without opening the message itself.
       Having to take that extra step can be more than a waste of time and money. Studies indicate that UCE often contains
       offensive subject matter, is a favored method for pursuing questionable if not fraudulent business schemes, and has
       been successfully used to spread harmful computer viruses." (*Ferguson v. Friendfinders, Inc.* (2002) 94 Cal.App.4th
       1255, 1268 [115 Cal.Rptr.2d 258].)

13     A Federal Trade Commission (FTC) study conducted before enactment of the CAN–SPAM Act found that most
       purported "remove me" links and addresses in a sample of 200 unsolicited commercial e-mails were invalid or
       ineffective. (The Integrity and Accuracy of the "WHOIS" Database, Hearings before the House Com. on Judiciary,
       Subcom. on Courts, the Internet, and Intellectual Property, 107th Cong., 2d Sess. (2002), prepared statement of
       Howard Beales, Dir. of the Bureau of Consumer Protection, FTC (May 22, 2001) < http://
       www.ftc.gov/os/2002/05/whois.htm> [as of Feb. 24, 2012].) Whether warranted or not, there is widespread consumer
       fear that using unsubscribe links will result in increased spam or other harms. (FTC, Effectiveness and Enforcement of
       the     CAN-SPAM     Act:     A     Rep.     to     Congress     (Dec.     2005)     at     pp.     A12–A14,
                                                                                                                    <

**Balsam v. Trancos, Inc., 203 Cal.App.4th 1083 (2012)**

138 Cal.Rptr.3d 108, 12 Cal. Daily Op. Serv. 2303, 2012 Daily Journal D.A.R. 2555

> http://www.ftc.gov/reports/canspam05/051220canspamrpt.pdf> [as of Feb. 24, 2012].)

14   Before filing suit, Balsam did send a certified, return receipt requested letter to USAProductsOnline.com at The UPS Store address provided in the e-mails, to which Trancos never responded. Nelson did not recall seeing the letter.

15   As further discussed *post,* the CAN–SPAM Act includes an express preemption clause preempting any state statute that "regulates the use of electronic mail to send commercial messages, *except* to the extent that any such statute ... *prohibits falsity or deception* in any portion of a commercial electronic mail message or information attached thereto." (15 U.S.C. § 7707(b)(1), italics added.)

16   Trancos also points out each e-mail included the advertiser's physical address. However, when the sender and advertiser are unrelated entities, including the advertiser's purported address does not affect whether the sender's identity is falsified or misrepresented.

17   We express no judgment about other circumstances in which (1) header information might be falsified or misrepresented for purposes of the statute or (2) the presence of other information identifying the sender in the body of the e-mail could affect liability under the statute.

18   "The 'fallacy of division' is the reverse of the fallacy of composition. It is committed when one argues that what is true of a whole must also be true of its parts." (*Rosen v. Unilever U.S., Inc.* (N.D.Cal., May 3, 2010, No. C 09–02563 JW) 2010 WL 4807100 at pp. *5–*6.)

19   The relevant facts in *Conway* were as follows: "After being informed of the practices of his subordinates by Mr. Elmer Kunkle, special investigator for the Department of Motor Vehicles, and by Ms. Elizabeth Steidel, [Conway] allowed these subordinates to continue in their positions and carry on their unlawful practices for the benefit of Pasadena Motors. The evidence shows a repeated pattern of illegal conduct by the agents of Pasadena Motors which indicates inferentially [Conway's] toleration, ratification, or authorization of their illegal actions." (*Conway, supra,* 42 Cal.App.3d at p. 886, 117 Cal.Rptr. 251.)

---

End of Document                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

1 | Timothy J. Walton (State Bar No. 184292)
2 | Jim C. Twu (State Bar No. 175032)
  | WALTON TWU LLP
3 | 9515 Soquel Drive Suite #207
  | Aptos, CA 95003
4 | Phone: (831) 685-9800
  | Fax: (650) 618-8687
5 |
6 | Daniel L. Balsam (State Bar No. 260423)
  | THE LAW OFFICES OF DANIEL BALSAM
7 | 2601C Blanding Avenue #271
  | Alameda, CA 94501
8 | Tel. & Fax: (415) 869-2873
9 |
  | Attorneys for Defendant
10 | KRISTINA KIRBY

11

12 | **UNITED STATES DISTRICT COURT**

13 | **NORTHERN DISTRICT OF CALIFORNIA (OAKLAND DIVISION)**

14

| 15 | XL MARKETING CORP. *et al.*, | ) Case No. | 4:11-cv-05107 (PJH) |
| 16 | | ) | |
|    | Plaintiffs, | ) **DECLARATION OF DANIEL BALSAM** | |
| 17 | | ) **IN SUPPORT OF DEFENDANT'S** | |
|    | vs. | ) **MOTION FOR ATTORNEY'S FEES** | |
| 18 | | ) | |
|    | KRISTINA KIRBY, | ) **Cal. Code Civ. Proc. §§ 1032, 1033.5** | |
| 19 | | ) | |
|    | Defendant. | ) Date: | May 14, 2014 |
| 20 | | ) Time: | 9:00 am |
|    | | ) Courtroom: | 3, 3rd Floor |
| 21 | | ) Judge: | Hon. Phyllis J. Hamilton |
| 22 | | | |

23 | I, Daniel Balsam, declare as follows:

24 |     1.   I am an attorney duly licensed to practice law before this Court.  I represent Defendant

25 |         Kristina Kirby ("Kirby") in this Action.  I make this Declaration based upon personal

26 |         knowledge.  If called upon to do so, I could and would testify to the truth of the facts

27 |         stated in this Declaration.

28

**1**

2. On behalf of Kirby, I sent demand letters to Plaintiffs XL Marketing Inc. *et al* (collectively, "Spire Vision"), alleging that Spire Vision advertised in/sent her 10 unlawful spams that violated California Business & Professions Code § 17529.5 (Section 17529.5), and offering to compromise her claims to $7,500.

3. Through the filing of this Motion, I spent 31.4 hours at $250 per hour and 33.8 hours at $300 per hour, for a total of $17,990, defending Plaintiffs' lawsuit against Kirby. Kirby incurred these fees strictly in her role as a *Defendant* to Plaintiffs' Complaint, as opposed to her role as a Counter-Claimant.

4. I expect to spend an additional 8.0 hours at $300, for a total of $2,400, reading Plaintiffs' Opposition to this Motion, preparing a Reply, and appearing at the hearing on the Motion. Kirby will incur these fees strictly in her role as a *Defendant* to Plaintiffs' Complaint, as opposed to her role as a Counter-Claimant.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and this Declaration was signed on March 6, 2014 in Alameda, California.

THE LAW OFFICES OF DANIEL BALSAM

/s/ Daniel L. Balsam
_____
Daniel L. Balsam
Attorney for Defendant Kristina Kirby

2

# EXHIBIT D

Timothy J. Walton (State Bar No. 184292)
Jim C. Twu (State Bar No. 175032)
WALTON TWU LLP
9515 Soquel Drive Suite #207
Aptos, CA 95003
Phone: (831) 685-9800
Fax: (650) 618-8687

Daniel L. Balsam (State Bar No. 260423)
THE LAW OFFICES OF DANIEL BALSAM
2601C Blanding Avenue #271
Alameda, CA 94501
Tel. & Fax: (415) 869-2873

Attorneys for Defendant
KRISTINA KIRBY

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA (OAKLAND DIVISION)

| | |
|---|---|
| XL MARKETING CORP. *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>KRISTINA KIRBY,<br><br>Defendant. | Case No.     4:11-cv-05107 (PJH)<br><br>**DECLARATION OF TIMOTHY WALTON IN SUPPORT OF DEFENDANT'S MOTION FOR ATTORNEY'S FEES**<br><br>**Cal. Code Civ. Proc. §§ 1032, 1033.5**<br><br>Date:         May 14, 2014<br>Time:         9:00 am<br>Courtroom:   3, 3rd Floor<br>Judge:        Hon. Phyllis J. Hamilton |

I, Timothy Walton, declare as follows:

1.   I am an attorney duly licensed to practice law before this Court.  I represent Defendant Kristina Kirby ("Kirby") in this Action.  I make this Declaration based upon personal knowledge.  If called upon to do so, I could and would testify to the truth of the facts stated in this Declaration.

**1**

2.  Through the filing of this Motion, I spent 24.7 hours at $400 per hour, for a total of $9,880, defending Plaintiffs' lawsuit against Kirby.  Kirby incurred these fees strictly in her role as a *Defendant* to Plaintiffs' Complaint, as opposed to her role as a Counter-Claimant.

3.  I expect to spend an additional 3.5 hours at $400, for a total of $1,400, reading Plaintiffs' Opposition to this Motion and preparing a Reply.  Kirby will incur these fees strictly in her role as a *Defendant* to Plaintiffs' Complaint, as opposed to her role as a Counter-Claimant.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and this Declaration was signed on March 6, 2014 in Aptos, California.

WALTON TWU LLP

/s/ Timothy J. Walton
Timothy J. Walton
Attorney for Defendant Kristina Kirby

DECLARATION OF TIMOTHY WALTON IN SUPPORT OF
DEFENDANT'S MOTION FOR ATTORNEYS' FEES

# EXHIBIT E


# *The* Trial Lawyer

Summer 2012

Sent Mail

Drafts

All Mail

Spam (88888)

Trash

# Balsam v. Trancos Inc.

## The Insiders' Perspective on the First Spam Trial in California  Page 14

Follow

**NOTEWORTHY VERDICTS**
**FOR DESERVING PLAINTIFFS**
Page 5

**REVISITING THE POLICY**
**LIMITS DEMAND**
Page 20

**COURTSIDE: SONOMA**
**COUNTY SUPERIOR COURT**
Page 12

# Balsam v. Trancos Inc.



## The Insiders' Perspective on the First Spam Trial in California

**By Dan Balsam and Timothy Walton**

**Trial Lawyer** asked us to write this article about *Balsam v. Trancos Inc.*, No. CIV471797 (Super. Ct. Cal. Cty. of San Mateo Mar. 10, 2010), *affirmed in all respects*, 203 Cal. App. 4th 1083 (1st Dist. 2012), *petition for review denied*, 2012 Cal. LEXIS 4979 (May 23, 2012). We believe it is the first case (other than small claims) by a consumer recipient to go to trial under California's anti-spam law, Business & Professions Code § 17529.5.

First, some background. California had anti-spam laws – B&P Code §§ 17538.4 and 17538.45 – as far back as 1998. But the laws had a number of weaknesses, not least of which was the omission of damages. After a California Court of Appeal found that California's anti-spam laws did not violate the dormant commerce clause of the U.S. Constitution and ruled that California has jurisdiction over out-of-state advertisers who send spam to California residents, *Ferguson v. Friendfinders, Inc.*, 94 Cal. App. 4th 1255 (1st Dist. 2002), the California Legislature took a look at increasing the laws' teeth. In 2003, California enacted B&P Code § 17529, which would have become the strongest state anti-spam law in the country. The statute made all spam unlawful, and granted recipients standing to sue for $1,000 liquidated damages per spam and/or actual damages. A separate subsection, § 17529.5, specifically made it unlawful to use third parties' domain names without permission; prohibited falsified, misrepresented, or forged information in email headers; and prohibited subject lines likely to mislead a recipient about the contents of the email. B&P Code § 17529.1(d) requires that email advertisers have "direct consent" from recipients to send them commercial email. The statute provides for attorneys' fees for the prevailing *recipient*, not the prevailing party. Unfortunately, B&P Code § 17529 does not grant injunctive relief, so after Proposition 64, there is no means for a court to order compliance with the law.

The Direct Marketing Association panicked and kicked its Congressional lobbying into high gear in late 2003. At that time, there were seven anti-spam bills pending in Congress. The DMA lobbied for the one that would allow for the most spamming. Congress, in response, passed the CAN-SPAM Act, 15 U.S.C. § 7701 et seq. and 18 U.S.C. § 1037... timed not coincidentally to go into effect on January 1, 2004 – the same date as B&P Code § 17529.

Many consider the CAN-SPAM Act to be a failure, at least from the perspective of stopping spam. For one thing, Congress made "truthful spam" legal, subject to certain requirements (e.g., inclusion of a physical mailing address and a means of opting-out). Congress made it illegal to spam after a person opted out, but denied that very person standing to sue. Only the Federal Trade Commission, State Attorneys General, and Internet Service Providers can sue under federal law. Worse, federal law preempts State anti-spam laws – such as California's – that *do* give recipients (individuals or businesses) the right to sue. But, there are some exceptions to preemption: by its own plain language, the CAN-SPAM Act does not preempt state laws that prohibit "falsity or deception" in commercial email, nor does it preempt state laws that are not specific to email. 15 U.S.C. § 7707(b).

The preemption question has been heavily litigated in federal and state courts. In *Omega World Travel, Inc. v. Mummagraphics Inc.*, 469 F.3d 348 (4th Cir. 2006), the Fourth Circuit read "falsity" as if it meant common-law fraud... and the scienter, reliance, and actual damages requirements that go along with it. The Court ignored the disjunctive "or deception," even though the plain language of the statute indicates that deception – even without falsity/fraud – is sufficient to avoid preemption. Spammers frequently glom onto *Omega* as if it categorically stands for preemption except for common law fraud, but what the Court really said was that federal law preempts State law – Oklahoma, in that case – as to the immaterial technical errors that only appeared in the "full headers" of the Omega spams that most recipients don't see.

Numerous cases in the Northern District of California read the preemption exactly as Congress wrote it – "falsity or deception" – not least because the CAN-SPAM Act uses the word "fraud" two lines later, suggesting that Congress meant two different things. In *Gordon v. Virtumundo Inc.*, 575 F.3d 1040 (9th Cir. 2009), the Ninth Circuit similarly ruled that federal law preempts (Washington) State law as to immaterial technical errors. Spammers also like to claim that Gordon stands for preemption except for fraud, but often neglect to mention that several courts in the Northern District found no preemption of California law, even after the Gordon decision. In fact, in direct response to Gordon, the court in Hoang v. Reunion.com even reversed its prior order granting defendant's motion to dismiss. 2010 U.S. Dist. LEXIS 34466 (N.D. Cal. Mar. 31, 2010).

In the summer of 2007, Balsam was between his second and third years of law school at U.C. Hastings, working for

the California Attorney General, Consumer Law Section in Los Angeles. Balsam received eight spams from eight different nonsensical domain names, all of which were proxy-registered through Domains By Proxy Inc. (which expressly prohibits use of its services for spamming). The "from names" (part of the email headers) were "Paid Survey," "Your Business," "Christian Dating," "Your Promotion," "Bank Wire Transfer Available," "eHarmony," "Dating Generic," and "Join Elite." All of the spams claimed that Balsam opted in on July 11, 2007 from an Internet Protocol address in Indiana. The body of each spam identified the sender only as "USAProductsOnline.com" – also a proxy-registered domain name – claiming its address to be a box at a branch of The UPS Store in Los Angeles.

Because the proxy registration prevented Balsam from querying the Whois database to identity Trancos, and of course The UPS Store would not identify its customer, Balsam filed a small claims action against "USAProductsOnline.com." As part of that case, Balsam sent a subpoena to The UPS Store for the identify of its boxholder. The UPS Store produced a copy of the application for the box, which identified "USA ProductsOnline.com" – not a company or even a registered fictitious business name – in the "Name of Firm or Corporation" line. However, that form did have a mailing address in Pacific Palisades, and further research on that address finally led to Trancos Inc.

Balsam contacted Trancos' Chief Executive Officer, Brian Nelson, and offered to settle his statutory claims against Trancos and the other entities advertised in the spams for $5,000. Nelson initially agreed, but then backed out on advice from his uncle, Trancos' lawyer.

Because the statutory damages of $8,000 exceeded the jurisdiction of the small claims court (at the time), and because Balsam also sought injunctive relief under the Consumers Legal Remedies Act, we filed an action in the Superior Court of San Mateo County – Trancos is headquartered in Redwood City – in 2008. Balsam was represented by Walton, who has litigated numerous anti-spam cases in supe-

rior and small claims court, as well as courts of appeal.

We wrote a highly detailed Verified Complaint that we intended to be "demurrer-proof," and Trancos did not try to demurrer. Trancos did, however, try to strike portions of the Complaint that it claimed were irrelevant and improper. We opposed, arguing that the text was necessary context that supported the factual allegations, and the Court denied the Motion. Trancos then filed the typical Answer one would expect from a defendant... denying almost everything, and setting forth no less than 18 affirmative defenses, none of which stated any facts in support. (For example, how exactly were Balsam's hands unclean...?) We demurred to the Answer – an uncommon but legitimate strategy – and knocked out 16 of the 18 defenses. Trancos was left with only federal preemption and "due care" (i.e., it took steps to prevent advertising in unlawful spam).

Trancos filed a Motion for Judgment on the Pleadings, which the Judge denied in its entirety, rejecting Trancos' arguments for preemption and against Balsam's CLRA standing. We filed a Motion for Summary Judgment/Adjudication, which the Court denied on procedural grounds: We unfortunately cited the Verified Complaint instead of filing a separate declaration to support the MSJ.

The case went to trial in October

2009 before Hon. Marie S. Weiner. We had an expert witness, with years of experience in online and traditional marketing, to discuss the spams' misleading content. Trancos had no experts. We argued that the "from names" misrepresented who was advertising in/sent the spams – an easy argument, since Nelson, Trancos' CEO, could not even identify his own clients based on the "from names." We argued that proxy registration misrepresented who owned the domain names, and that one of the subject lines "Get paid 5 Dollars for 1 survey" was misleading. We argued that in B&P Code § 17500 actions, "fraud" does not mean the common-law tort but rather the likelihood of deception, and we argued strongly for a reading of the plain language of the statutes and the presumption against preemption in areas – such as advertising – traditionally regulated by the States. It was undisputed that Balsam was in Los Angeles on July 11, 2007 – the date Trancos claimed Balsam supposedly opted in from an I.P. address in Indiana.

Trancos finally revealed on the first day of trial an interesting piece of information that it had never disclosed during written discovery – that it acquired Balsam's email address from Hi-Speed Media Inc., a subsidiary of ValueClick Inc. ValueClick, incidentally, was the defendant in



Dan Balsam graduated from U.C. Hastings in 2008, after a career in traditional and online marketing. Balsam earned an MBA from The Anderson School at UCLA (1998) and an AB degree from Harvard University (1991). Balsam created the DanHatesSpam.com website as a diary and a resource for plaintiffs. Balsam also represents clients in breach of contract, consumer protection, and wrongful foreclosure actions.



Timothy Walton was one of the first attorneys in the world to have a web site. He established his law office in 1998, specifically to focus on Internet law. Walton began suing spammers in 1999, and has been counsel of record for numerous anti-spam activists, both in trial court and on appeal.

another published opinion in a spam case: *Hypertouch v. ValueClick Inc.*, 192 Cal. App. 4th 805 (2d Dist. 2011). The *Hypertouch* Court ruled that advertisers are strictly liable for their affiliates, that B&P Code § 17529.5 – which only prohibits false and deceptive spam – fits squarely within the exception-to-preemption set forth by the CAN-SPAM Act, and spam recipients do not have to plead or prove common-law fraud or actual damages. We were prepared to prove at trial that not only had Balsam not opted in to receive commercial email from Value-Click, but he had actually affirmatively and repeatedly taken steps to opt *out* from ValueClick spam, including suing ValueClick. But that was not actually necessary, because even *if* Balsam had opted in to receive ValueClick emails, that would not constitute "direct consent" for Trancos to send him commercial email.

In March 2010, the trial court issued the Judgment and Final Statement of Decision, ruling that B&P Code § 17529.5 is not preempted, and a spam recipient does not have to prove actual damages. The court awarded Balsam $7,000 in liquidated damages, finding that all of the "from names" except "eHarmony" misrepresented who was sending/advertising in the spams. The court found that proxy registration misrepresented who owned the domain names. The court was not impressed with Trancos' claim, unsupported by any facts, that it tried to avoid advertising in deceptive spam. In fact, the court found that Trancos intentionally established practices and procedures to avoid all attempts to identifying it, such as proxy-registering its domain names, claiming a box at The UPS Store as its address, falsifying its box application at The UPS Store, and properly registering FBNs for every division of the company except the spamming division. The court also ruled that Balsam did not have standing under the CLRA because Balsam was not a "consumer" and did not sustain any monetary loss. Finally, the court ruled that Nelson was not jointly and severally liable because he was acting at all relevant times as an officer and employee of Trancos. Balsam requested $148K in attorneys' fees (including a Lodestar

multiplier for Walton), and the trial court awarded $82K.

Trancos appealed on the B&P Code § 17529.5 cause of action based only on federal preemption. Trancos incorrectly claimed that the trial court's ruling was based on spamming from multiple domain names, as opposed to proxy-registered domain names. Trancos also appealed the award of attorneys' fees. Trancos never showed the slightest bit of remorse, and admitted that it had stopped spamming only because it wasn't profitable; Trancos never acknowledged that anything it did was wrong.

Balsam cross-appealed on the CLRA cause of action, arguing that the language of Civil Code § 1770 ("transaction *intended to result* in the sale or lease of goods or services") means that the Legislature did not intend to impose an actual purchase requirement, and that the California Supreme Court's ruling in *Meyer v. Sprint Spectrum*, 45 Cal. 4th 634 (2009) held that the CLRA requires any damages, which are broader than pecuniary damages. Balsam also cross-appealed as to Nelson's personal liability, arguing that the fact that Nelson was acting in his capacity as a Trancos officer

does not relieve him of liability for his own wrongful actions, and that his testimony indicated awareness and ratification of Trancos' unlawful actions.

In February 2012, the Court of Appeal affirmed the trial court's ruling in all respects, and went into far more detail as to the proxy domain name registration argument than the misrepresented "from names" argument. As to the B&P Code cause of action, the Court agreed with *Hypertouch* that § 17529.5 is not preempted, that the generic "from names" misrepresented the source, and that consent to A does not mean that B has "direct consent" to send commercial email. The Court sharply criticized the steps Trancos took to hide its identity as the spammer, and even endorsed the common belief that opting out of spam is futile because it costs more for a spammer to honor the opt-out request than to keep spamming. As to the CLRA cause of action, the Court ruled that Balsam did not have standing, but for a different reason than the trial court – any harm caused by the spams (see B&P Code § 17529(d), (e), (g), and (h)) arose from receiving the spams, not by any misleading content. The Court acknowledged that corporate officers are liable



## Hope is not a retirement strategy...

## ...be proactive about your Financial Future

**Complimentary** Initial Meeting with a
**Certified Financial Planner**

For All Members of SFTLA

Retirement Planning · Education Planning · Cash Flow Analysis
Investment Planning · Risk Management

**MassMutual**
FINANCIAL GROUP®

You can't predict. You can prepare.®

For an initial consultation:

C. Greg Crothers, CFP ®
415-743-1012
gcrothers@finsvcs.com

for their own tortious acts, but found that Nelson's involvement was not significant enough to impose personal liability. The Court also affirmed the award of attorneys' fees, noting that the amount was quite reasonable and would have been significantly greater but for the fact that Balsam cannot claim attorneys' fees for the substantial time he spent on his own case.

Trancos filed a Petition for Rehearing in the Court of Appeal, which the Court denied in March 2012, but modified the Opinion slightly without making any substantive changes.

Refusing to accept defeat, Trancos petitioned the California Supreme Court for review. Trancos claimed

that it did not know what "readily traceable" meant as to domain name registration information, despite the Supreme Court's previous adoption of the simple dictionary definition for "trace." Trancos claimed the instant facts were identical to those in *Kleffman v. Vonage Inc.*, 49 Cal.4th 334 (2010), but in that case, the Supreme Court ruled that sending spam from multiple domain names does not violate B&P Code § 17529.5 and did not address the proxy-registration question, because the domain names were traceable to Vonage's affiliates. Trancos also claimed that the CAN-SPAM Act does not prohibit proxy registration for spamvertised domain names,

which is facially false – 18 U.S.C. § 1037(a)(3), (a)(4), and (d)(2) do exactly that – although Balsam never alleged standing under the CAN-SPAM Act. Moreover, Trancos claimed that the Supreme Court had to resolve a conflict between the Appellate Districts, even though the Court of Appeals' ruling in the First District below was entirely consistent with the previous *Hypertouch* ruling in the Second District. In May 2012, the California Supreme Court denied Trancos' Petition.

As we write this article, Trancos has indicated that it intends to petition for review to the U.S. Supreme Court. Stay tuned. **TL**



# THE BAR ASSOCIATION OF SAN FRANCISCO
## LAWYER REFERRAL AND INFORMATION SERVICE

*Make the Responsible Client Referral*

**When a client's legal need falls outside your practice area…** Refer with confidence to BASF's Lawyer Referral and Information Service (LRIS).

**State and nationally recognized as the model for legal referrals**

**Addressing the Bay Area community's diverse legal needs**
- Personalized service from professional, multi-lingual staff
- Referrals to experienced, insured San Francisco attorneys
- Continuous oversight from the first phone call to the final settlement



The Lawyer Referral and Information Service is a non-profit public service of The Bar Association of San Francisco
To find out more about the LRIS please visit us at www.sfbar.org/lris
For Clients:      (415) 989-1616
For Attorneys:  (415) 477-2374

1

2   Kavon Adli, California State Bar No. 203040
    Seth W. Wiener, California State Bar No. 203747
3   THE INTERNET LAW GROUP
    609 Karina Court
4   San Ramon, California 94582
    Telephone:    (925) 487-5607
5   Facsimile:     (310) 356-3257

6
    Attorneys for Defendant
7   LendingTree, LLC

8                       UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10                         SAN FRANCISCO DIVISION

11
    CARMEN SORIANO, an individual;          Case No. 17-cv-7078
12   MARY JOYCE VALLARTA, an individual;
    MOLLY VONGCHAN, an individual,          Removed from the Superior Court of the
13                                           State of California for the City and
                                             County of San Francisco
14              Plaintiffs,                  Case No. CGC-17-561185

15        vs.                                **PROOF OF SERVICE**

16   LENDINGTREE, LLC, a Delaware limited liability
    company; and DOES 1-100,
17
18              Defendants.

19
20        I am employed by The Internet Law Group.  I am over the age of 18 and not a party to the
    within action.  My business address is 609 Karina Court, San Ramon, CA 94582.

21        On December 12, 2017, I served the foregoing document described as **DECLARATION
    OF SETH W. WIENER IN SUPPORT OF DEFENDANT'S NOTICE OF REMOVAL
22   UNDER 28 U.S.C. §§1332(a), 1441, 1446,** on the interested parties in this action by placing a
    true copy thereof enclosed in a sealed envelope addressed as follows:
23
    Jacob Harker, Esq.
24   Law Offices of Jacob Harker
    582 Market Street, Suite 1007
25   San Francisco, CA 94104
    Tel. (415) 624-7602
26   Fax (415) 684-7757
    Email: jacob@harkercounsel.com

27
28
    Declaration of Seth W. Wiener in Support of Notice of Removal
                                    Page 3

1

Daniel L. Balsam, Esq.
The Law Offices of Daniel Balsam
2601C Blanding Avenue #271
Alameda, CA 94501
Tel. (415) 869-2873
Fax (415) 869-2873
Email: legal@danbalsam.com

2

3

4

5       **By MAIL** as follows:  I am "readily familiar" with my employer's practice of collection
and processing correspondence for mailing.  Under that practice it would be deposited with the
U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles,
California, in the ordinary course of business.  I am aware that on motion of party served, service
is presumed invalid if postal cancellation date or postage meter is more than one (1) day after date
of deposit for mailing in affidavit.

6

7

8       I declare under penalty of perjury under the laws of the United States of America that the
above is true and correct.

9

10      Executed on December 12, 2017, at San Ramon, California.

11

12

_____

13              **Seth W. Wiener**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28